Opinion by Justice Moseley
Deion Reed and Torry Jamal Reed were both implicated in the murder of Deaundray Rossum. A Gregg County jury convicted Deion of one count of murder and one count of aggravated robbery. On each count, Deion was sentenced to sixty years' imprisonment and was ordered to pay a $10,000.00 fine. On appeal, Deion argues (1) that the trial court erred in failing to include an accomplice-witness instruction *753 in the jury charge, (2) that the trial court erred in failing to suppress extraneous-offense evidence of another shooting allegedly caused by Deion, and (3) that the evidence is legally insufficient to support the jury's findings of guilt on both counts alleged in the State's indictment.
We conclude that Deion was not egregiously harmed by the failure to include an accomplice-witness instruction, that the trial court did not abuse its discretion in allowing evidence of an extraneous offense, and that Deion's conviction was supported by legally sufficient evidence. Accordingly, we affirm the trial court's judgment.
I. Factual Background
On the night of May 15, 2012, the Longview Police Department (LPD) received reports that shots had just been fired in the Signal Hill apartment complex parking lot. LPD officers Dennis Phillips and Benny Cooks were dispatched to Signal Hill with instructions to be on the lookout for an orange Mitsubishi Eclipse, which they soon spotted. While witnesses urged Phillips to quickly attend to Elginn Jackson, who was alive but had just been shot in the back, Cooks went to inspect the Eclipse. He found Rossum slumped over in the driver's side of the vehicle, dead from gunshot wounds to the head and neck. Jackson was taken to the hospital by ambulance as Phillips and Cooks began the murder investigation.
Jimmie Redmon, a physical evidence specialist with the LPD, arrived on the scene and collected several .380 caliber and nine-millimeter cartridge casings from the parking lot. Redmon also located Jackson's wallet on the ground, and Longview police office Chris Taylor found a cell phone later discovered to belong to Brendon Douglas. In examining Rossum, LPD found no money on his person. Redmon and Taylor processed the Eclipse for fingerprints, but only found prints from Rossum and other known occupants of the vehicle.
Cooks testified that a man named Marcus Davis was in the parking lot when the shooting occurred. Davis testified that he was living with his girlfriend, Franceshell Nelson, and their children at Signal Hill and that they were returning home when they witnessed the shooting. Nelson testified that she saw an unfamiliar man walking down the stairs as she and her oldest son entered her ground-floor apartment. While Davis, who was taking their four-year-old son out of a car seat, was still in the parking lot, Nelson heard multiple shots being fired. Nelson immediately ran inside and called 9-1-1 to report the incident. She peeked out of the window to make sure Davis and her son were okay and happened to see an "older model," "light color" car speeding by. Unfortunately, neither Davis nor Nelson could identify the shooter.
David Cheatham, a detective with the LPD, turned to Jackson in hopes that he could supply additional information. Jackson testified that he grew up with Rossum, who drove the Eclipse, and saw him "pretty much every day." On the morning of the shooting, Rossum arrived at Jackson's house with his friend, Don Robert Perry, Jr. According to Jackson, the group's goal for the day was to acquire a large amount of marihuana and cocaine to sell. In order to accomplish their goal, Jackson, Rossum, and Perry went to a McDonald's in Longview to meet Douglas, who had promised Rossum that he could facilitate the drug purchase through his connection in Shreveport. Jackson testified that he was carrying $2,000.00 in cash to make the large drug purchase and that Rossum had pulled out his cash several times in front of Douglas in order to count it. After ensuring that they had enough money, the group drove to Shreveport, waited for *754 some time for Douglas' connection, and decided to return home to Longview empty-handed after it became apparent that they would be unable to acquire the drugs. Jackson said Rossum was aggravated with Douglas for his false promise that he could get cheaper marihuana in Shreveport.
Jackson testified that Douglas "was texting a lot" on the way back from Shreveport and asked Rossum to pull into Signal Hill before dropping him home so he could purchase a marihuana blunt from someone living in an upstairs apartment. According to Jackson, Rossum let Douglas out of the back seat and waited by the car as Douglas went upstairs to buy his blunt. Jackson testified that two men wearing gray hoodies and basketball shorts approached the Eclipse, asked Rossum an undiscernible question, waited for Rossum to respond that Douglas was upstairs, and then started shooting. Jackson jumped out of the car as soon as he heard gunshots, tried to run, was shot in the back, and fell.[1] Jackson testified that he heard Douglas say, "Man, you shot me" to the shooters and then instructed them to check Jackson's pockets. Scared, Jackson pretended to be dead as the shooters went through his pockets, but were unable to find any money.
Perry, who was in the back seat of the Eclipse with Douglas, also testified that Douglas was texting and smiling on the way back from Shreveport. Perry confirmed Jackson's testimony that the group went to Signal Hill because Douglas wanted to purchase a blunt. He testified that he saw Douglas coming back downstairs as two men wearing gray hoodies, black shorts, black shoes, gray socks, and white undershirts approached. According to Perry, Douglas "shook their hand and looked both ways, and took off running. And then that's when they started shooting." Because he was in the back seat, Perry was unable to escape. While he was still in the car, he saw one of the shooters reach into Rossum's pocket to take his wallet. The shooter saw Perry, froze for a second, and ran away.
Neither Perry nor Jackson was able to identify the shooters. However, Jackson told Cheatham that they had climbed into a light-colored Lincoln with Douglas and sped off. Since Jackson's description of the getaway car was similar to Nelson's, the LPD set out to find the getaway vehicle.
Brandon Thornton and Chris Taylor, officers with the LPD, were both stationed at Good Shepherd Medical Center when a light-colored Lincoln dropped Douglas off at the emergency room to receive medical treatment for his gunshot wound. According to Taylor, Douglas was uncooperative, did not allow gunshot residue testing to be conducted on his hands, and claimed he had been shot at a local EZ Mart store. Thornton and Taylor were both informed that the people who brought Douglas to the emergency room were standing outside in the parking lot around a vehicle. Thornton and Taylor located the light-colored Lincoln, which was identified as belonging to Gabrina Ward. Although Ward was not present, she provided her consent to search the vehicle that was being driven by Korvarsia Skinner.
Ward testified that she allowed Skinner to borrow her light-colored Lincoln Town Car from time to time. Ward said she was getting ready to go to the store on the day of the incident and, when she was ready to leave her apartment, was shocked to find her keys missing and the car gone. Ward testified that Skinner and Douglas were at her apartment while she was getting ready, and she knew that they must have *755 taken the car. Ward called Skinner and, according to Ward, Skinner and Douglas admitted that they had taken the car, but assured her that it would soon be returned.
During the course of the investigation, Taylor was able to extract text messages from Douglas' telephone in order to uncover more information about the Signal Hill shooting. Taylor extracted the following text message conversation between Douglas and someone using a telephone number labeled in Douglas' telephone as "Reed":
Reed: "Dnt go to [Ward's] house wen u get back dwn hur ... If [Ward] ... call u dnt answer"
Douglas: "were yall at ... b behind ezmart in 30min"
Reed: "We still got da car wat u wnt to do"
Douglas: "b at ezmart wit da kar n thirty min"
Reed: "Ok we finna go up dur now ima park on da side"
Douglas: "u ready or not m* * * * * * * * *"
Reed: "Nigga we already hur waitin on u"
Douglas: "say yall pop da driver n I got da passenger.... okk tell [Skinner] I said iiiiiiiiiight mane"
Reed: "Do u wnt us to park in signal hill or da feed store"
Douglas: "say soon as I get out pop da driver ... signal hill"
Reed: "We gone b in da back bro...."
Douglas: "naw just park at signal hill boi ... ok bout 15min we b der"
Reed: "You want us to walk up to the car as soon as yall pull up"
Douglas: "yea wen u c him open da door open for me"
Reed: "So he gettin out"
Douglas: "yeah im n da back it's a two door kar.... n nigga put dat bitch smooth to his head n pop his ass"
Reed: "How much he got"
Douglas: "$1000.... light"
Reed: "So when I hit the driver you.hittin the passenger?"
Douglas: "yea.... okk we finna pull up"
Reed: "Yeah"[2 ]
This conversation occurred on the day of the shooting, with the last few messages being exchanged just before Rossum was shot. Because the messages established Douglas' participation in the murder, he was convicted of capital murder. Douglas v. State , 489 S.W.3d 613, 618 (Tex. App.-Texarkana 2016, no pet.). In setting out to find other suspects, the LPD spoke to Skinner.
Skinner testified that he went to Ward's house and that, contrary to Ward's testimony, Leonard Mitchell was also present. According to Skinner, Ward voluntarily turned over the keys to her car and went to shower. Skinner said that Douglas, who he had known for his entire life, "popped up" as he was retrieving a CD out of Ward's car and that he, Douglas, and Mitchell went back to Ward's apartment where they were met by sixteen-year-old Reed. Skinner testified that while he was in the bathroom, he heard Douglas telling Deion "about a lick."
On Douglas' request, the group left Ward's apartment in her car while Ward was still in the shower. After they spent time at Douglas' house, Douglas asked to be dropped off at McDonalds. As he was being dropped off, Skinner testified that *756 he, Mitchell, and Deion were instructed to wait for Douglas at Signal Hill. After Douglas failed to appear in a timely manner, the trio drove to another apartment complex to meet a friend of Mitchell's. Leaving Deion behind, Skinner and Mitchell got out of the car to find a telephone they could use to call Douglas. Afterward, they returned to the car, met with Deion, and drove to Deion's house, where his brother, seventeen-year-old Torry Jamal Reed, was present. Skinner testified that he used Torry's telephone to communicate with Douglas, who was angry that the group had failed to meet him at Signal Hill as instructed. The group then went to a friend's house, where Torry, Deion, and Mitchell got out of the car, while Skinner stayed inside. Skinner testified that he again used Torry's telephone to text Douglas in order to establish his whereabouts. After Mitchell, Deion, and Torry returned to the car with Dashun Taylor, Skinner began driving the group back to Ward's house. On the way, Skinner said Torry informed him that Douglas wanted them to pick him up from a local EZ Mart store. They waited for Douglas for twenty or thirty minutes before driving to Signal Hill to see if he was there.
Skinner testified that he parked Ward's car in the Signal Hill parking lot, where Deion and Torry, who were wearing jogging shorts and gray hoodies, hopped out. They walked around an apartment building toward an area where Skinner testified he soon heard gunshots. Skinner said he cranked up the car, pulled around to see what happened, and witnessed Douglas running from an orange Eclipse. Skinner testified that Douglas got in the car with him, Mitchell, and Taylor, and told them to head to the hospital. Skinner testified that he was about to drive off when Torry and Deion jumped in the car as well. En route to the hospital, Skinner pulled over to the side of the road to let Torry and Deion out of the car. Before they left, Skinner testified that Douglas passed Deion and Torry a nine-millimeter Hi-Point gun and that he had already seen Deion brandishing a chrome .380 caliber weapon that day. Skinner, who had been charged with aggravated robbery in connection with the Signal Hill incident, claimed that he never knew Rossum.
Officers learned that Torry and Deion were living in their grandmother's home, and a search warrant was prepared after reports of the Reed brother's involvement in the Signal Hill shooting. Dan Registad, LPD senior crime scene detective, testified that he assisted other officers in executing the search warrant on the Reed home. Registad testified that the search team recovered a loaded ".380" AMT Kurz pistol (AMT pistol) underneath a sofa cushion in the living room. Torry and Deion's mother, Elizabeth Reed, testified that Torry normally slept on the couch. LPD also located two, live "9-millimeter + P" bullets with "some stars on the headstamp" along with "black athletic shorts ... wedged down between the box spring and the wall" in one of the bedrooms.[3] Torry and Deion were both arrested.
Elizabeth expressed shock that Torry and Deion were implicated in Rossum's murder. She testified that Torry had a pre-paid cell phone having a number that did not match the telephone number labeled as "Reed" in Douglas' cell phone, which was used in the text message exchange with Douglas prior to the murder. However, telephone records introduced at trial demonstrated that the telephone used in the text message exchange called Elizabeth several times both before and after the murder.
*757 Following the arrest of the Reed brothers, evidence collected at Signal Hill was compared to the evidence seized from the Reed home. Wade Davison Thomas, II, a forensic scientist with the DPS's Tyler Regional Laboratory, testified that two Winchester .380 cartridge casings and two .380 cartridge casings with a Federal headstamp were collected at Signal Hill by LPD officers after the shooting. According to Thomas, ballistics testing definitively revealed that all four of those cartridges were fired from the AMT pistol found under the cushions on the sofa in the Reed home.[4] Thomas also noted that three nine-millimeter Luger cartridge casings were collected at the Signal Hill apartments and that the live bullets found in the bedroom in the Reed home were encased in nine-millimeter Luger cartridge casings.[5] Thomas also testified that additional .380 cartridge casings were located at Signal Hill and another .380 bullet was recovered from Rossum's body, but that none of those projectiles were fired from the AMT pistol. From the ballistics evidence, Thomas concluded that there were three separate firearms on the scene of the Signal Hill shooting.
At trial, Deion's defensive strategy included a challenge to Skinner's credibility. Over objection, the State introduced evidence of an extraneous offense that occurred seventeen days before the Signal Hill shooting. Peyton Glaspie testified that he was present at a home on Webster Street along with several friends, including Torry and Deion. Glaspie testified that the group was hanging out when a neighbor, Tyson Dixon, came out of his home and started "some gang-like, altercation" with Deion. Glaspie testified that Dixon charged at Torry and Deion and that either Torry or Deion pulled out a gun and started shooting. Eric J. Tevebaugh, an LPD officer, was dispatched to the scene of the Webster Street shooting and collected cartridge casings and a bullet found on site. Thomas testified that the .380 cartridge casing with Federal headstamp, .380 cartridge casing with Tula headstamp, and .380 bullet recovered from the Webster Street shooting were all fired from the AMT pistol found in the Reed home.
After a lengthy deliberation, the jury found Deion guilty on both counts of the State's indictment.
II. Lack of an Accomplice-Witness Instruction Did Not Result in Egregious Harm
Deion argues that the trial court erred in failing to include an accomplice-witness instruction in its charge to the jury. Our review of alleged jury charge error involves a two-step process. Abdnor v. State , 871 S.W.2d 726, 731 (Tex. Crim. App. 1994) ; see Sakil v. State , 287 S.W.3d 23, 25-26 (Tex. Crim. App. 2009) ; Ngo v. State , 175 S.W.3d 738, 744 (Tex. Crim. App. 2005). Initially, we determine whether an error occurred and then "determine whether sufficient harm resulted from the error to require reversal." Abdnor , 871 S.W.2d at 731-32 ; see Almanza v. State , 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); see also Middleton v. State , 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).
Here, it is undisputed that Skinner was an accomplice witness. Accordingly, Deion was entitled to an accomplice-witness instruction indicating that a conviction is not valid without corroboration of an accomplice's testimony. See *758 TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (stating that the trial court shall "deliver to the jury ... a written charge distinctly setting forth the law applicable to the case"), art. 38.14 (West 2005); see also Freeman v. State , 352 S.W.3d 77, 82-83 (Tex. App.-Houston [14th Dist.] 2011, pet. ref'd) (holding that trial court erred in failing to instruct jury sua sponte that testimony of accomplice was required to be corroborated in accord with Article 38.14).
Our finding that Deion was entitled to an accomplice-witness instruction does not end our analysis. The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error. Abdnor , 871 S.W.2d at 732. Here, because Deion did not object to the jury charge, we will not reverse unless the record shows the error resulted in egregious harm such that he did not receive a fair and impartial trial. See Ngo , 175 S.W.3d at 743-44 (citing Almanza v. State , 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g) ); Loun v. State , 273 S.W.3d 406, 416 (Tex. App.-Texarkana 2008, no pet.).
In assessing "egregious harm under Almanza in the context of the failure to submit an accomplice-witness instruction ..., 'appellate review must inquire whether the jurors would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.' " Casanova v. State , 383 S.W.3d 530, 533 (Tex. Crim. App. 2012) (quoting Saunders v. State , 817 S.W.2d 688, 692 (Tex. Crim. App. 1991) ). "That non-accomplice evidence may be, at a bare minimum, sufficient to support a finding that the accomplice witness's testimony was corroborated, when viewed in the light most favorable to the jury's verdict, does not dispose of the question of egregious harm." Id. at 534. Instead, we review the whole record "to assess whether the jury, had it been properly instructed on the law requiring corroboration of accomplice-witness testimony, 'would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.' " Id. (quoting Saunders , 817 S.W.2d at 692 ).
"Whether error in failing to submit an accomplice-witness instruction will be deemed harmful is ... a function of the strength of the corroborating evidence." Id. at 539 (citing Herron v. State , 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) ). "The strength of that evidence is, in turn, a function of (1) its reliability or believability and (2) how compellingly it tends to connect the accused to the charged offense."[6] Id. "As the strength of the corroborating evidence increases ... a reviewing court may no longer be able to declare that the lack of an accomplice-witness instruction resulted in egregious harm." Id. When
corroborating evidence gains in strength to the point that it becomes implausible that a jury would fail to find that it tends to connect the accused to the commission of the charged offense, then a *759 reviewing court may safely conclude that the only resultant harm is purely theoretical and that there is no occasion to reverse the conviction, even in the face of an objection, since the jury would almost certainly have found that the accomplice witness's testimony was corroborated had it been properly instructed that it must do so in order to convict.
Id. at 539-40.
"In determining whether non-accomplice evidence tends to connect a defendant to the offense, ... 'the evidence must simply link the accused in some way to the commission of the crime and show that rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense.' " Simmons v. State , 282 S.W.3d 504, 508 (Tex. Crim. App. 2009) (quoting Malone v. State , 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (internal quotation marks omitted) ). "[W]hen there are conflicting views of the evidence-one that tends to connect the accused to the offense and one that does not-we will defer to the fact[-]finder's resolution of the evidence." Smith v. State , 332 S.W.3d 425, 442 (Tex. Crim. App. 2011).
Here, several witnesses testified that they saw two shooters, who were dressed alike, gun down Rossum and Jackson in the Signal Hill parking lot. Douglas' telephone, which was recovered at the scene of the shooting, revealed the plot to commit Rossum's murder and steal his money. The text message exchange was between Douglas and a contact he had labeled as "Reed" in his telephone. Because Douglas asked the user of that telephone to convey a message to Skinner, it was clear that someone other than Skinner was using the telephone during the text conversation. Telephone records indicated that the telephone had placed several calls to Elizabeth both before and after the murders, indicating that the Reed brothers were using that telephone, and Elizabeth testified that Torry also had another telephone.
At the scene of the murder, LPD recovered two separate sets of .380 caliber cartridge casings and another set of nine-millimeter Luger casings. When LPD searched the Reed home, they located the murder weapon in the living room sofa, as well as live, nine-millimeter, Luger bullets and a pair of "black athletic shorts ... wedged down between the box spring and the wall" in one of the bedrooms. Although Elizabeth testified that Torry slept on the couch, the couch was located in a common room in a house where Deion also lived. The size and brand of the bullet found at the scene of the crime matched the ones located in the bedroom, which also contained black shorts like the ones Perry testified the shooters were wearing. The jury also heard evidence that Torry and Deion were involved in the Webster Street shooting, less than a month before the Signal Hill shooting, and that the AMT pistol had been used in that crime.
The evidence recovered from eyewitnesses, Douglas' telephone, the search of the Reed home, and ballistics testing was neither unreliable nor unbelievable. That evidence not only tended to connect Deion to the commission of the offense as a party, but was strong enough for us to conclude that, had the jury been properly instructed on the law requiring corroboration of accomplice-witness testimony, it would not have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.[7]
*760 Accordingly, we find that Deion was not harmed by the omission of the accomplice-witness instruction. We overrule his first point of error.
III. The Trial Court Did Not Abuse Its Discretion in Admitting the Extraneous Offense
In his second point of error, Deion argues that the trial court erred in admitting evidence of the Webster Street shooting because (1) the trial court erred in determining that a jury would be able to find that Deion committed the Webster Street shooting beyond a reasonable doubt, (2) it was inadmissible under Rule 404(b), and (3) its probative value was substantially outweighed by the danger of unfair prejudice.[8] We disagree.
A. Standard of Review
"A trial judge's decision on the admissibility of evidence is reviewed under an abuse of discretion standard and will not be reversed if it is within the zone of reasonable disagreement." Tillman v. State , 354 S.W.3d 425, 435 (Tex. Crim. App. 2011) (citing Davis v. State , 329 S.W.3d 798, 813-14 (Tex. Crim. App. 2010) ; Russeau v. State , 291 S.W.3d 426, 438 (Tex. Crim. App. 2009) ). Abuse of discretion occurs only if the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." Taylor v. State , 268 S.W.3d 571, 579 (Tex. Crim. App. 2008) ; see Montgomery v. State , 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). We may not substitute our own decision for that of the trial court. Moses v. State , 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. De La Paz v. State , 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).
B. The State's Proffer
Prior to Glaspie's testimony, the State informed the trial court that it sought to introduce extraneous-offense evidence showing that Deion was the perpetrator of the April 28, 2012, Webster Street shooting. In its proffer, the State specifically represented to the trial court that "[w]itnesses at the [Webster Street] house indicated that the shooter was Deion Reed." The State argued that casings found at Signal Hill and near Rossum's body "were positively compared as a match to the casings at the scene on Webster." It explained that its need to introduce the extraneous-offense evidence included, in addition to the issue of identity, rebuttal of the defensive theory that Skinner was fabricating Deion's presence at Signal Hill. The State *761 added that the extraneous-offense evidence would demonstrate that "in fact Deion Reed was in possession of that firearm" used in the Signal Hill shooting.
Deion objected on the grounds that Skinner was not involved in the Webster shooting, which happened seventeen days before the Signal Hill shooting, and that the probative value of the extraneous offense was substantially outweighed by the danger of unfair prejudice.[9] Following the State's proffer, the trial court admitted the extraneous-offense evidence after assuring Deion that it would give a Rule 404(b)(2) limiting instruction. The trial court reasoned that the two offenses, which it believed were similar, occurred in close proximity to one another and that in questioning Skinner, the defense had raised the issue of Deion's identity, intent, plan, and knowledge of the Signal Hill shooting.
C. The Trial Court's Rule 104(b) Ruling
As a preliminary question, "in deciding whether to admit extraneous offense evidence in the guilt/innocence phase of trial, the trial court must, under rule 104(b), make an initial determination at the proffer of the evidence, that a jury could reasonably find beyond a reasonable doubt that the defendant committed the extraneous offense." Fischer v. State , 268 S.W.3d 552, 556 (Tex. Crim. App. 2008) (quoting Harrell v. State , 884 S.W.2d 154, 160 (Tex. Crim. App. 1994) ). Deion contends that the court erred in its assessment. We disagree.
Prior to the State's proffer, Skinner had testified that he saw the AMT pistol in Deion's hands on the day of the Signal Hill shooting. During its proffer, the State represented that witnesses at the Webster Street shooting placed this same weapon in Deion's hand. Deion did not challenge that representation. "If the ruling [on admissibility] was correct on any theory of law applicable to the case, in light of what was before the trial court at the time the ruling was made, then we must uphold the judgment." Martin v. State , 173 S.W.3d 463, 467 (Tex. Crim. App. 2005). Because "what was before the trial court at the time the ruling was made" is the critical question, we cannot say that the trial court abused its discretion in making its preliminary determination that the jury could reasonably find, beyond a reasonable doubt, that Deion committed the Webster Street shooting. See Willover v. State , 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).[10]
*762 D. The Trial Court's Rule 404(b) Ruling
"[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Carson v. State , 515 S.W.3d 372, 374 n.3 (Tex. App.-Texarkana 2017, pet. granted) (citing TEX. R. EVID. 404(b) ). However, evidence of "other crimes, wrongs, or acts" may be admissible if that evidence has relevance apart from its tendency "to prove the character of a person in order to show action in conformity therewith." Id. (citing TEX. R. EVID. 404(b) ). " Rule 404(b) sets out an illustrative, not exhaustive, list of exceptions to the prohibition against admitting evidence of extraneous offenses including 'proof of ... identity.' " Daggett v. State , 187 S.W.3d 444, 451 n.13 (Tex. Crim. App. 2005) (quoting TEX. R. EVID. 404(b) ).
Deion's appellate argument contends that the extraneous-offense evidence was inadmissible under Rule 404(b) because his "challenge to Skinner's credibility ... should not be sufficient cause to 'open the door' to rebuttal by extraneous acts." Here, Deion put identity at issue in this case by contending (1) that he was not even present at the scene of the Signal Hill shooting and (2) that Skinner's testimony indicating Deion was present and was one of the shooters was a lie. "Once [Deion] placed his identity in issue, the State could offer evidence of an extraneous offense to prove his identity if there was some distinguishing characteristic common to both the extraneous offense and the offense for which [he] was on trial." Hartsfield v. State , 305 S.W.3d 859, 871-72 (Tex. App.-Texarkana 2010, pet. ref'd).
"A distinguishing characteristic is usually the accretion of small, sometimes individually insignificant, details that marks each crime as the handiwork or modus operandi of a single individual." Id. at 871-72 (citing Segundo v. State , 270 S.W.3d 79, 88 (Tex. Crim. App. 2008) ). "No rigid rules dictate what constitutes sufficient similarities; rather, the common characteristics may be proximity in time and place, mode or manner of commission of the crimes, ... or any other elements which mark both crimes as having been committed by the same person." Id. at 872.
Here, the trial court noted that both shootings were committed seventeen days apart in the same city. Of greater import was the fact that the same caliber and brands of cartridge casings were found at the scene of both crimes, the same weapon was used to commit both crimes, and the weapon was recovered from the Reed home. Since these distinguishing characteristics were common to both the Webster Street shooting and the Signal Hill shooting, the Webster Street shooting was admissible to prove the element of identity. See id. Moreover, at the time of the State's proffer, the trial court was informed that witnesses of the Webster Street shooting had identified Deion as the one holding the weapon. Accordingly, we find no abuse of discretion in the trial court's Rule 404(b) ruling.
E. The Trial Court's Rule 403 Ruling
Next, in our Rule 403 analysis,
*763 we should consider (1) how compellingly evidence of the extraneous offense serves to make a fact of consequence more or less probable, (2) the potential that the extraneous offense will impress the jury in some irrational but indelible way, (3) the trial time needed to develop the evidence, and (4) the proponent's need for the extraneous offense evidence.
Id. at 873 (citing Wheeler v. State , 67 S.W.3d 879, 888 (Tex. Crim. App. 2002) ); see Montgomery , 810 S.W.2d at 389-90. These factors "are known as the Montgomery factors." Douglas , 489 S.W.3d at 627.
Here, the extraneous-offense evidence, showing Deion's participation in the Webster Street shooting, whether as the shooter or as a party to that offense, was very probative of the issue of identity at the Signal Hill shooting given that the same weapon was used to carry out both crimes. "While ... extrinsic crimes are by their nature prejudicial to the defendant," the jury was instructed not to consider the evidence for purposes other than the ones listed in the trial court's limiting instruction. Hartsfield , 305 S.W.3d at 873. In light of the limiting instruction, because the Webster Street shooting "was not as flagitious as the evidence in the primary case," it "should not [have] create[d] such prejudice that the jury could not consider it for the proper purpose." Id. Direct testimony from witnesses at trial regarding the Webster shooting was minimal, comprising less than twenty pages of a three-day trial with a total of nineteen witnesses. Because Deion's participation at Signal Hill was a hotly contested issue, the trial court could reasonably conclude that the State had a great need for the evidence. See ids="7299453" index="44" url="https://cite.case.law/sw3d/305/859/#p871">id. ; Wheeler , 67 S.W.3d at 889.
After weighing the Montgomery factors, we conclude that the trial court's decision to admit the extraneous-offense evidence in this case fell within the zone of reasonable disagreement and thus was not an abuse of discretion. Accordingly, we overrule Deion's Rule 403 argument.
Because we overrule Deion's Rule 104(b), 404(b), and 403 challenges to the extraneous-offensive evidence, we find that the trial court did not abuse its discretion in admitting evidence of the Webster Street shooting. We overrule Deion's second point of error.
IV. Legally Sufficient Evidence Supports the Finding that Deion Was a Party to Both Offenses
In his last point of error, Deion argues that the evidence is legally insufficient to support his conviction because: (1) although the .380 gun that killed Rossum was found in the Reed home where he and Torry slept, "either could have logically been connected with that firearm," (2) no one at the scene could identify Deion except Skinner, (3) although Skinner saw Deion with the AMT pistol earlier that day, he did not testify that he saw Deion with the weapon at the scene, (4) Skinner testified that he took "direction from Torry about where to park ... due to Torry coordinating with Douglas on his phone," (5) although Skinner heard Douglas telling Deion about a "lick," he "did not go into more detail with [Deion] regarding the 'lick,' " and (6) "[a]ll other evidence is suggestive of Appellant's mere presence at the time and place of the shooting."[11]
*764 In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. Brooks v. State , 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing Jackson v. Virginia , 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ); Hartsfield v. State , 305 S.W.3d 859, 863 (Tex. App.-Texarkana 2010, pet. ref'd). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. Brooks , 323 S.W.3d at 917-18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the Brooks opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Hooper v. State , 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson , 443 U.S. at 318-19, 99 S.Ct. 2781 ); Clayton v. State , 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).
Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. Malik v. State , 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The "hypothetically correct" jury charge is "one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." Id.
Count I of the State's indictment alleged that Reed intentionally or knowingly caused Rossum's death by shooting him with a firearm. Count II alleged that Reed "while in the course of committing theft of property and with intent to obtain or maintain control of said property, intentionally, knowingly, or recklessly cause[d] bodily injury to D. Rossum by shooting D. Rossum with a firearm," a deadly weapon. A fair reading of Deion's brief leads us to conclude that he challenges the element of identity.
Here, we begin by noting that the jury was charged on the law of the parties. Under Section 7.02 of the Texas Penal Code,
(a) A person is criminally responsible for an offense committed by the conduct of another if:
....
(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; ....
....
(b) If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.
TEX. PENAL CODE ANN. § 7.02 (West 2011).
"Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense and encourages its commission by words or other agreement."
*765 Ransom v. State , 920 S.W.2d 288, 302 (Tex. Crim. App. 1994) (op. on reh'g); see Beier v. State , 687 S.W.2d 2, 3 (Tex. Crim. App. 1985) (citing Tarpley v. State , 565 S.W.2d 525 (Tex. Crim. App. [Panel Op.] 1978) ). "The agreement, if any, must be before or contemporaneous with the criminal event." Beier , 687 S.W.2d at 3-4 (citing Urtado v. State , 605 S.W.2d 907 (Tex. Crim. App. [Panel Op.] 1980) ). "Mere presence alone without evidence of intentional participation is insufficient." Id. at 4 (citing Acy v. State , 618 S.W.2d 362 (Tex. Crim. App. [Panel Op.] 1981) ).
Moreover, "[a] conviction for an aggravated offense must be supported by evidence that the defendant committed, or was criminally responsible for committing, the aggravating element." Wyatt v. State , 367 S.W.3d 337, 341 (Tex. App.-Houston [14th Dist.] 2012, pet. ref'd, untimely filed) (citing Stephens v. State , 717 S.W.2d 338, 340 (Tex. Crim. App. 1986) ). Thus, in an aggravated robbery case involving a defendant who is charged as a party to the offense, it is insufficient to merely prove that the defendant intended to promote or assist a theft; rather, the State must prove that the defendant intended to promote or assist an aggravated robbery by soliciting, encouraging, directing, aiding, or attempting to aid another person in committing the aggravated robbery. See ids="9968714" index="67" url="https://cite.case.law/sw2d/717/338/#p340">id. ; Wooden v. State , 101 S.W.3d 542, 548 (Tex. App.-Fort Worth 2003, pet. ref'd). Specifically, "there must be direct or circumstantial evidence that appellant not only participated in the robbery before, while, or after a [deadly weapon] was displayed, but did so while being aware that the [deadly weapon] would be, was being, or had been, used or exhibited during the offense." Wyatt , 367 S.W.3d at 341 (quoting Anderson v. State , No. 14-00-00810-CR, 2001 WL 1426676, at *1 (Tex. App.-Houston [14th Dist.] Nov. 15, 2001, pet. ref'd) (not designated for publication) ).
"In determining whether the accused participated as a party, the court may look to events occurring before, during and after the commission of the offense, and may rely on actions of the defendant which show an understanding and common design to do the prohibited act." Beier , 687 S.W.2d at 4. "Circumstantial evidence may be used to prove one is a party to an offense." Id.
Skinner testified that on the day of the murder, he overheard Douglas telling Deion "about a lick." According to Skinner, Deion was brandishing the AMT pistol that day. After the group had picked up Torry, the text message conversation revealed that Douglas instructed someone in the group that Rossum had $1,000.00 and encouraged them to shoot Rossum in the head at Signal Hill. Because Skinner drove Ward's car to Signal Hill, the jury could have rationally concluded that Douglas' instructions were being delivered to Skinner and others in the group, including Deion.
Once at Signal Hill, Skinner testified that Deion and Torry, who were wearing jogging shorts and gray hoodies, hopped out and walked to the Signal Hill parking lot. Jackson described the two men, and Perry testified that Douglas "shook their hand and looked both ways, and took off running. And then that's when they started shooting." This evidence, combined with Skinner's testimony, indicated Douglas' agreement with Deion and Torry to carry out the crimes. Witnesses described multiple rounds being fired, and ballistics testing revealed the presence of three shooters.
Jackson testified that the shooters rifled through his pockets, and Perry testified that one of the shooters grabbed Rossum's wallet. Although Jackson testified that Rossum was carrying a significant amount *766 of money that day, LPD found no money on his person, permitting an inference that it had been stolen by the shooters. Skinner testified that Deion and Torry jumped into the light-colored Lincoln with Douglas to make their getaway.
At the Reed home, the LPD located the .380 caliber murder weapon under a sofa in the living room, black athletic shorts, and the same brand of nine-millimeter bullets that were used at the Signal Hill shooting. Additionally, the jury heard that Deion and Torry were recently jointly involved in a shooting altercation at Webster Street and that one of them had fired the AMT pistol at Dixon.
In examining the totality of the evidence in a light most favorable to the verdict of guilt, we conclude that a reasonable jury could reach the conclusions that Deion knew about the plan to steal Rossum's money and was either one of the Signal Hill shooters or aided or attempted to aid Torry to commit the offense of aggravated robbery. Further, because the jury could have rationally found that Deion, who knew about the "lick," was a co-conspirator, the evidence was legally sufficient to find Deion guilty as a party to Rossum's murder since it was committed on Douglas' direction in furtherance of the purpose of stealing Rossum's money. Accordingly, we find the evidence legally sufficient to support the jury's conviction of Deion for both murder and aggravated robbery. We overrule Deion's last point of error.
V. Conclusion
We affirm the trial court's judgment.

In total, Jackson was shot four times.

During cross-examination, Taylor admitted that he did not know what individuals were using the telephones.

Elizabeth testified that Deion slept in one of the bedrooms.

Ballistics testing also revealed that a .380 caliber bullet recovered from Douglas' body was fired from the AMT pistol.

Thomas said that the cartridge casings at Signal Hill also had a Cyrillic headstamp.

As stated in Casanova ,
Corroborating evidence that is exceedingly weak-that is to say, evidence that, while it is legally sufficient to tend to connect, is nevertheless inherently unreliable, unbelievable, or dependent upon inferences from evidentiary fact to ultimate fact that a jury might readily reject-may call for a conclusion that the failure to give the accomplice-witness instruction resulted in harm regardless of whether the deficiency was objected to. Corroborating evidence this weak may thus result in both egregious harm and some harm.
Id. (citation omitted).

Moreover, the jury was informed that Skinner was currently charged with aggravated robbery and knew he could also be charged with Rossum's murder. The jury also heard Skinner admit that he had a motive to help himself with his testimony. These facts were weighed by the jury in assessing Skinner's credibility.

At trial, Deion objected to the admissibility of the extraneous offense by raising the following argument:
Judge, obviously I would object to that extraneous coming in on multiple grounds. One is, this happened-this alleged occurrence happened 17 days prior. Korvarsia Skinner was not involved in the extraneous whatsoever. And that since it was 17 days prior, that would not indicate as to my client shooting an individual on May the 15th; it's not a close enough connection. And that would certainly violate Rule 403 where the probative value would be substantially outweighed by the prejudicial value.
A "point of error on appeal must comport with the objection made at trial." Wilson v. State , 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) ; see Swain v. State , 181 S.W.3d 359, 367 (Tex. Crim. App. 2005). On appeal, Deion argues that the extraneous offense was irrelevant under Rule 401 of the Texas Rules of Evidence. However, because Deion failed to raise this issue at trial, we find that Deion has waived his Rule 401 argument asserted for the first time on appeal.

Deion also objected based on the fact that the cartridge casings found at the Webster Street shooting had been destroyed.

Glaspie testified that Dixon was trying to fight both Deion and Torry and that either Torry or Deion pulled out a gun and started shooting. The record demonstrates that Glaspie's testimony that he could not identify the shooter may have come as a surprise to the State, in light of the following exchange:
Q. [By the State] And did the police come to you at some point and ask you about what had happened?
A. Yes, ma'am. I was at school.
Q. And did you talk to them?
A. I did talk to them.
....
Q. Do you remember telling them that Deion had a gun in his pocket?
A. I don't remember that.
Q. Do you remember telling them that Torry told Deion, "Get out the gun, I'm not fixing to fight"?
A. I don't remember that.
Q. And then do you remember telling them that Deion started shooting?
A. I don't remember that.
Q. Okay. You don't remember that or you don't remember telling the detective that?
A. I don't remember telling the detective that. And I don't remember, like, verbatim. I remember talking to them, but I don't remember play by play.
Q. Do you remember that you told them that Deion shot about four times?
A. I don't remember.
Q. Do you remember telling them that Deion was the only one that was shooting?
A. I don't remember that.
Q. Do you remember telling them that Deion only aimed at Tyson?
A. I don't remember that.
After Glaspie's testimony, Deion did not ask the court to strike the evidence of the Webster Street shooting or revisit its ruling regarding its admissibility.

In his legal sufficiency analysis, Deion does not argue "the discrete issue of the sufficiency of non-accomplice testimony to corroborate." See Casanova , 383 S.W.3d at 533 (citing Simmons , 282 S.W.3d at 508 ). In any event, the threshold for determining whether a defendant is egregiously harmed by the omission of an accomplice-witness instruction is higher than that required to determine sufficient corroboration of accomplice testimony. See ids="6946395" index="78" url="https://cite.case.law/sw3d/282/504/#p508">id. at 534.