

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| SONIA BAUTISTA, | § | No. 08-15-00362-CR |
| Appellant, | § | Appeal from the |
| v. | § | 120th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC#20130D03636) |
| | § | |

# **O P I N I O N**

Sonia Bautista appeals her conviction for murder.   In ten issues, Appellant contends:

1.  There was legally insufficient evidence to show she intended to cause serious bodily injury to the victim and committed an act clearly dangerous to human life;

2.  There was legally insufficient evidence to show she committed felony murder;

3.  The trial court erred in submitting a charge that would allow the jury to convict her of murder if it found she assisted in the underlying robbery, causing her egregious harm;

4.  The trial court erred in submitting a charge that did not require the jury to find she assisted in performing an act clearly dangerous to human life, causing her egregious harm;

5.  The trial court erred in submitting a charge that did not require the jury to find the act clearly dangerous to human life actually caused the victim's death, causing her egregious harm;

6.  The trial court erred in submitting a definition on the reasonableness standard of self-

defense, causing her harm;

7. The trial court erred in instructing the jury that if it found her actions did not meet the reasonableness standard of self-defense it should find against her on the issue of self-defense, causing her harm;

8. The trial court erred in including a charge on self-defense as it relates to deadly force, causing her harm;

9. The trial court erred in overruling her objection to improper jury argument by the State that the jury only needed to believe she knew her co-defendant's intended to rob the victim; and

10. The trial court erred in denying her motion for new trial because her trial counsel was constitutionally ineffective for giving her the leeway to select punishment-phase witnesses.

For the following reasons, we affirm.

## BACKGROUND

Jose Castanon was murdered on May 17, 2013. Castanon was a marijuana dealer, but just prior to his death had recently begun selling ecstasy pills. Castanon was described as 5'5", skinny, and was known by others as T-Rex—a nickname he had acquired because he was missing several fingers from his left hand. Castanon had known the Appellant, Sonia Bautista, since attending middle school with her, but the two were not truly acquainted with one another until Appellant began buying marijuana from him about a year before his murder. They had stopped speaking a few months before his death over an incident in which Appellant and her codefendant, Briana Garay, had arranged for Castanon to sell a large quantity of marijuana to one of Appellant's neighbors. Appellant and Garay took Castanon to the neighbor to complete the deal, but instead of paying for the drugs the neighbor beat Castanon up and stole his marijuana. Castanon accused Appellant of setting him up and threatened to hurt her and her family if he ever discovered that she had known he was going to be robbed. Thereafter, the two were on bad terms.

2

On the night of the murder, Appellant, Garay, and the other codefendant, Ricky Macias, went together to a nightclub. The trio left there about midnight when they went to a house party of a friend of Appellant's. They had a few drinks with the other partygoers, but Garay and Macias kept to themselves. Appellant left them alone because she thought Macias wanted to be "more than friends" with Garay and wanted some time alone to flirt with her. She continued to bring them drinks and to introduce them to others, and after about two hours the trio left the party.

As they drove away, Garay began texting Castanon to see if he would sell her ecstasy. Castanon replied that he would rather wait until the following day because he did not conduct business late at night, but Garay insisted that she would not buy them the next day—she wanted them immediately or not at all. After some back and forth, Castanon agreed to let her come by his house and buy eight doses of ecstasy, but he insisted she come alone and park in his driveway. Despite her assurances she would do so, she, Appellant, and Macias proceeded to his home and parked up the street.

While this text exchange was going on, Castanon had been at the home of his neighbor, George Najera. Castanon had moved in across the street from Najera after graduating from high school in 2011. Najera testified he was awake at that late hour because he was taking care of his sick mother, who woke up about every two hours to go to the bathroom. He had been sitting out on his front porch when Castanon saw him from across the street and walked over to chat with him. Castanon began texting while visiting with Najera and after exchanging a few text messages informed him someone would be coming by to meet with him. When Appellant, Macias, and Garay drove by and parked up the street, Castanon said "they're here," and returned home. Najera saw a male and a female exit the car and walk to Castanon's house. He remained on his porch for

3

about two minutes until his mother called him in. As he was walking in, he heard what sounded like a male moan and the sounds of struggling and stomping. The neighborhood dogs began barking and as he turned to look back he saw another female get out of the parked car and quickly approach Castanon's house.

As Najera was helping his mother in the bedroom he heard sounds of people running on gravel. He looked out through the window and saw what he perceived to be the shadows of people quickly leaving Castanon's house. He assisted his mother to the restroom and then quickly returned to his front window, where he saw the car the three individuals had come in speed away. Najera tried calling Castanon on the phone four or five times but never received an answer. Although he was worried, he decided against calling the police because he knew Castanon was a drug dealer and he did not want to get him into trouble. He also did not want to go check on Castanon himself because he did not want to get involved in whatever might have happened. In the light of the following day, Najera looked outside and saw Castanon's front door was wide open and the house was devoid of activity. Shortly after making this observation, two females pulled up to Castanon's and went inside. A fire truck and police squad cars arrived moments later.

One of the women whom Najera had seen walk into the house was Daniela Espino. Espino had known Castanon for about a year and a half and the two were scheduled to meet up around 2:00 p.m. that afternoon. She testified she became concerned when Castanon did not respond to her text messages that morning because they typically exchanged morning texts. When she subsequently called him and did not get an answer, she decided to go to his home to see if something had happened to him. When Espino arrived at Castanon's, she walked in to find Castanon lying on the floor with a pair of blue jeans twisted around his neck. The house was in

4

disarray; the cabinet doors in the kitchen were hanging open and a cookie jar lay shattered on the floor. Castanon was motionless and did not respond to her calls, so she dialed 911. The operator asked her to attempt to perform CPR but when Espino pulled the jeans from Castanon's neck he spit up a white liquid and she was too disturbed to make the attempt. The 911 operator instructed her to wait outside for emergency services and she complied.

Captain Ruben Candelaria of the El Paso Fire Department responded to the 911 dispatch and arrived on the scene shortly thereafter. He entered the home and found Castanon lying on the kitchen floor with bruises all over his face and body as though he had been beaten. The room was in shambles, and it appeared to Candelaria that a struggle had taken place based on his observation of the broken ceramic pieces on the floor and open cabinets. Candelaria quickly determined Castanon was dead and cancelled the ambulance.

Detective Ray Sanchez was called to investigate Castanon's death. He testified he reviewed text messages on Castanon's cellphone and determined that his last contact had been with Macias's cellphone. He and another officer went to Macias's home, who voluntarily accompanied them to the police station. While speaking with Macias, Sanchez discovered that Appellant had been present that night and promptly went to her home to speak with her. She also agreed to go to the police station and gave a video-recorded statement.

In her recorded statement, Appellant admitted to having gone to Castanon's house with the others that night to get the ecstasy. She claimed Garay had entered the house alone to buy the pills. Shortly after Garay entered the home she heard Garay scream for help, and she rushed in to find Garay and Castanon struggling. Appellant began punching Castanon with her fists, and Castanon grabbed a pair of scissors and attempted to stab her with them. She took the scissors

5

away from Castanon, and yelled for Macias. Macias promptly entered and began struggling with Castanon. Both men ended up on the floor. Appellant claimed she continued to hit Castanon but could not recall how many times because she was so "pissed" with him due to his prior threats against her. She stated that Macias wrapped the jeans around Castanon's neck while they struggled on the floor. As Macias held the jeans around Castanon's neck, Appellant smashed a ceramic cookie jar on Castanon's head. She claimed the reason the cabinet doors were left hanging open was because Macias or Garay had ransacked the home for pills after the fight.

Detective Sanchez was later able to identify the clothing that Appellant, Garay, and Macias had worn that evening by viewing the security-camera footage from the night club they had attended before the murder. A search warrant was subsequently executed at Macias's house, and police seized a black shirt, a vest, a red necktie, and a white undershirt, all of which were covered with what police suspected to be blood. A search warrant was also executed at Appellant's home to recover the clothing she wore that evening, but her clothing did not show any visible blood stains. Appellant, Garay, and Macias were subsequently arrested and charged with Castanon's murder.

At trial, the State also introduced cellphone records of text messages exchanged between Appellant, Garay, and Macias after leaving Castanon's that night and returning to their respective homes. In the text messages, Macias complained his face hurt but followed up by acknowledging the three had "got down." Appellant stated that she had received multiple cuts on her hand and that it was hurting her, and Garay stated that she was taking care of Appellant. The State also introduced the testimony of Michaela Bedwell, who was a full-time student at UTEP at the time of trial. Bedwell testified that Macias sold her ecstasy pills the day after the murder. When the

6

two met up, Macias entered her vehicle and produced a gallon-size Ziploc bag filled almost to the halfway point with ecstasy. He sold her two pills and told her to call him whenever she needed more.

Appellant testified in her own defense. She and Castanon had been friends for around a year after she started purchasing marijuana from him, and they had had a falling out after her neighbor beat him and stole his marijuana. Regarding the evening of Castanon's murder, her recollection differed in some respects from the video-recorded statement she gave to detectives the night she came in for questioning. She testified she did not know they were going to Castanon's to get ecstasy until the moment they turned onto his street. Macias and Garay both entered Castanon's house initially while she waited in the car. According to Appellant, she entered the house because Garay called her cellphone screaming for help, and once she entered the house she saw Macias and Castanon struggling. She noted that the cabinet doors were already open at this point. Being frightened, she ran into a bathroom to hide until the sounds of the altercation had stopped. She then tried to leave the house but was attacked by Castanon, who grabbed her by the hair and started punching her. She began punching Castanon back, causing him to let go of her hair. He then grabbed a pair of scissors and lunged at her, managing to slice her hand. She grabbed a jar and threw it at Castanon, striking him with it. At this moment, Macias reemerged and grabbed Castanon, allowing Appellant the opportunity to run out of the house. Garay ran out behind her and they both jumped into the car and waited for Macias. Macias took a long time to return to the car. Garay told Appellant that when Castanon had produced the ecstasy pills, Garay snatched them out of his hand, thus starting the altercation. Macias returned to the vehicle with scratch marks on his face that had not been there when Appellant left the house and then the three

7

of them drove away.

Appellant claimed she first learned of Castanon's death on Facebook the next day and was in disbelief. Appellant testified that she, Garay, and Macias got together and discussed what happened. According to Appellant, Macias insinuated that he would arrange an assault on Appellant and Garay in jail if they told the police what happened. She did not recall her statement to the police. Appellant stated that the discrepancies between her testimony and her video-recorded statement was the result of her drinking that night and her inability to understand their questions. She further claimed she gave inaccurate statements because she was afraid Macias would carry out his threat if she implicated him. On cross-examination, Appellant stated she had neither seen the pills Garay claimed to have taken from Castanon nor a gallon-sized bag containing ecstasy.

The jury found Appellant guilty of murder. She elected to have the jury assess punishment. During the punishment phase, several witnesses appeared on Appellant's behalf. Appellant's former employer testified to her good performance as an employee. A long-time family friend testified to Appellant's good character and how the murder did not conform to that behavior. Appellant's husband testified that she was a good wife and a good mother to their child. Appellant also took the stand and testified about her marriage, her child, her education, and her volunteer work with her church.

The jury sentenced Appellant to forty-eight years' confinement and assessed a $10,000 fine. This appeal followed.

## DISCUSSION

### Sufficiency of the Evidence

8

In her first and second issues, Appellant asserts: (1) there was legally insufficient evidence to show she intended to cause serious bodily injury to Castanon and committed an act clearly dangerous to human life; and (2) there was legally insufficient evidence to show Appellant committed felony murder.

### Standard of Review

In a sufficiency challenge, the reviewing court does not act as a thirteenth juror, reweighing the evidence and substituting its judgment for that of the jury. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999), *holding modified by Guidry v. State*, 9 S.W.3d 133 (Tex.Crim.App. 1999). We view the evidence in the light most favorable to the verdict and will uphold the conviction if there is sufficient evidence to justify a jury to rationally find the appellant guilty beyond a reasonable doubt on all essential elements of the offense. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). The evidence is measured against the hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex.Crim.App. 2009). A hypothetically correct jury charge lists all elements of the offense, is consistent with the indictment, and does not unnecessarily increase the prosecution's burden of proof. *Id*.

### Applicable Law

Relevant to the present case, a person commits the offense of murder under two circumstances: (1) she intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (2) she commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, she commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

9

TEX.PENAL CODE ANN. § 19.02(b)(2)–(3)(West 2011). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX.PENAL CODE ANN. § 1.07(46)(West Supp. 2018). An act clearly dangerous to human life is one that creates a substantial risk of death. *Depauw v. State*, 658 S.W.2d 628, 634 (Tex.App.--Amarillo 1983, pet. ref'd); *White v. State*, No. 03-07-00731, 2011 WL 4825650, at *5 (Tex.App.--El Paso Oct. 12, 2011, pet. ref'd)(not designated for publication).

Under Texas law, a defendant may be held criminally responsible as a party for an offense committed by another under certain enumerated circumstances. TEX.PENAL CODE ANN. § 7.02 (West 2011). One such circumstance is when the defendant—acting with intent to promote or assist the commission of the offense—solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX.PENAL CODE ANN. § 7.02(a)(2). Evidence is sufficient to support a conviction under this section where the defendant is physically present at the commission of the offense and encourages the commission of the offense by either words or other agreement. *Beier v. State*, 687 S.W.2d 2, 3 (Tex.Crim.App. 1985)(*citing Tarpley v. State*, 565 S.W.2d 525 (Tex.Crim.App. 1978)). There must be evidence of intentional participation; mere presence alone is insufficient. *Id*., at 4. In determining whether the defendant participated as a party, the court may look to events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant evincing an understanding and common design to do the prohibited act. *Id*., at 4 (*citing Medellin v. State*, 617 S.W.2d 229 (Tex.Crim.App. 1981)); *Reed v. State*, 550 S.W.3d 748, 765 (Tex.App.--Texarkana 2018, no pet.). That each party was doing some part of the common purpose is sufficient to show the parties were acting together.

10

*Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1985).

A second relevant circumstance under which a defendant may be held liable for an offense committed by another is described in the Penal Code as follows:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX.PENAL CODE ANN. § 7.02(b).

As with party liability, participation may be inferred from the circumstances and may be demonstrated by direct or circumstantial evidence. *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex.Crim.App. 1987). The reviewing court should review events occurring before, during, and after the commission of the offense and may rely on actions of the defendant evincing an understanding and common design to commit the offense. *King v. State*, 29 S.W.3d 556, 564 (Tex.Crim.App. 2000).

### *Analysis*

Here, the hypothetically correct jury charge for serious-bodily-injury murder as a party would require the jury to find beyond a reasonable doubt that; (1) Appellant, (2) acting as a party, (3) with intent to promote or assist the commission of the offense of murder by soliciting, encouraging, directing, aiding, or attempting to aid Macias or Garay, (4) with intent to cause serious bodily injury to Castanon, (5) committed an act clearly dangerous to human life by compressing Castanon's neck with jeans, (6) that caused Castanon's death. TEX.PENAL CODE ANN. § 19.02(b)(2); TEX.PENAL CODE ANN. § 7.02(a)(2).

The jury heard evidence—through Appellant's video-recorded statement to police—that

11

she smashed the ceramic cookie jar on Castanon's head while he was lying on the floor and while Macias had the blue jeans wrapped around Castanon's neck. The jury also heard her state on the video that she had been punching him while he and Macias struggled on the floor and continued to do so after Macias had begun strangling him with the blue jeans. She also stated that she could not recall how many times she punched him because she was furious with him over his alleged prior threats against her. The medical examiner testified that Castanon died from asphyxiation due to compression of his neck. From this evidence, a jury could have rationally concluded that Appellant intended to assist Macias by participating in beating Castanon and smashing a jar on him while he was being strangled, that she intended to cause serious bodily injury to Castanon and intended to and did assist Macias in committing an act clearly dangerous to human life resulting in Castanon's death. *Beier*, 687 S.W.2d at 3. While her testimony at trial regarding her participation that night differed significantly from her recorded statement, the jury—as the sole judge of witness credibility and the weight to be given to individual testimony—was within its prerogative to disbelieve her trial testimony. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex.Crim.App. 2010)(appellate court is required to defer to the jury's credibility and weight determinations); *Padilla v. State*, 326 S.W.3d 195, 201 (Tex.Crim.App. 2010)(rational fact finder can consider a defendant's inconsistent statements in connection with other circumstances as affirmative evidence of guilt). Accordingly, there was sufficient evidence for the jury to rationally conclude that Appellant was a party to the offense under Section 7.02(a)(2) based on her presence and participation. TEX.PENAL CODE ANN. § 7.02(a)(2). Because the charge was submitted under the alternative theories of serious-bodily-injury murder and felony murder and the jury returned a general verdict, our holding that there was legally sufficient evidence for the

12

jury to find her guilty as a party to serious-bodily-injury murder negates the necessity to address her sufficiency challenge to a finding of felony murder. *Gonzalez v. State*, 8 S.W.3d 640, 641 (Tex.Crim.App. 2000)(when a jury returns a general verdict on alternate theories of committing the same offense, the verdict stands if the evidence is sufficient to support a finding under any of the theories submitted)(*citing Griffin v. U.S.*, 502 U.S. 46, 49, 112 S.Ct. 466, 469, 116 L.Ed.2d 371 (1991)). Thus, Appellant's first and second issues are overruled.

## Jury Charge Error: Egregious Harm

In her third, fourth, and fifth issues, Appellant alleges jury charge errors each of which resulted in egregious harm. In Issue Three, she contends the charge erroneously allowed the jury to find her guilty of murder as a party if it found she assisted in the commission of a robbery but did not require it to find she assisted in the commission of an act clearly dangerous to human life or intended to assist in causing Castanon's death. In Issue Four, Appellant contends the trial court's charge failed to require the jury to find that she intended to assist Garay and Macias in causing serious bodily injury to Castanon or require it to find she assisted in the commission of an act clearly dangerous to human life or intended to assist in causing Castanon's death. In Issue Five, Appellant asserts the trial court's charge allowed the jury to find her guilty of felony murder without requiring that the jury find the underlying felony and the associated act clearly dangerous to human life caused Castanon's death. Appellant did not object to any of these alleged errors at trial.

### *Standard of Review*

An appellate court reviews a claim of jury-charge error by first determining whether an error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If the

13

reviewing court finds error in the charge, it then analyzes that error for harm. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003). The level of harm required for reversal depends on whether the defendant objected to the error at trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1985)(op. on reh'g). When a defendant fails to object or states that he has no objection to the charge, the court will not reverse for jury-charge error unless the record shows "egregious harm" to the defendant. *Ngo*, 175 S.W.3d at 743–44. This is a difficult standard to meet and requires a showing that the defendant was deprived of a fair and impartial trial. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex.Crim.App. 2011). The record must demonstrate actual rather than theoretical harm. *Torres v. State*, 543 S.W.3d 404, 414 (Tex.App.--El Paso 2018, pet. ref'd)(*citing Cosio v. State*, 353 S.W.3d 766, 777 (Tex.Crim.App. 2011)). "To establish actual harm, the charge error must have affected the very basis of the case, deprived Appellant of a valuable right, or vitally affected a defensive theory." *Id*. In making that determination, we review: (1) the entire charge; (2) the state of the evidence, including the contested issues and the weight of the probative evidence; (3) the arguments of counsel; and (4) any other relevant information revealed by the record. *State v. Sanchez*, 393 S.W.3d 798, 803 (Tex.App.--El Paso 2012, pet. ref'd)(*citing Ngo*, 175 S.W.3d at 750 n.48).

### *Applicable Law*

The duty of the trial court in charging the jury is to communicate to the jury each statutory definition that affects the meaning of an element of an offense. TEX.CODE CRIM.PROC.ANN. art. 36.14 (West 2007); *see also Villarreal v. State*, 286 S.W.3d 321, 329 (Tex.Crim.App. 2009); *Vasquez v. State,* 389 S.W.3d 361, 366 (Tex.Crim.App. 2012)("The purpose of the trial judge's jury charge is to instruct the jurors on all of the law that is applicable to the case."). The

14

application paragraph of the jury charge applies the relevant penal law, abstract definitions, and general legal principles to the facts of the case and the indictment allegations. *Vasquez*, 389 S.W.3d at 366. When the application paragraph of a jury charge incorrectly applies the relevant penal law to the facts of a given case, it is erroneous. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex.Crim.App. 2015). "[T]erms which have a technical legal meaning may need to be defined . . . particularly . . . when there is a risk that the jurors may arbitrarily apply their own personal definitions of the term or where a definition of the term is required to assure a fair understanding of the evidence." *Middleton*, 125 S.W.3d at 454.

Appellant relies primarily on the case of *Nava v. State* to support her contention that the trial court provided erroneous instructions to the jury regarding felony murder. In *Nava*, the appellant and his codefendant were charged with felony murder and organized criminal activity. *Nava v. State*, 415 S.W.3d 289, 292 (Tex.Crim.App. 2013). As part of a sting operation conducted by the Houston Police Department, an undercover officer arranged to sell purportedly stolen televisions to Nava's codefendant. *Id.*, at 292. Nava, his codefendant, a third man, and a young woman arrived at the arranged meeting location to purchase the stolen televisions. *Id.* After agreeing on the price and paying the undercover officer, the officer—who was wearing a wire—gave the signal for police to move in by stating "It's a done deal." *Id.* But this was the wrong signal phrase, and the defendants became increasingly agitated because the officer was not handing over the keys to the van containing the stolen televisions. *Id.* As the officer repeated the incorrect phrase, the third man approached the officer from behind with a pistol drawn and demanded the keys. *Id.* From the audio recording, it sounded as if Nava said, "Shoot him!" and,

15

after demanding the keys once more, the man shot the officer in the back. *Id*., at 293. The officer died of his injuries. *Id*.

Nava was convicted of murder as a party and sentenced to sixty years' imprisonment. *Nava*, 415 S.W.3d at 292. On appeal, he complained a paragraph in the application portion of the charge misled the jury and may have allowed it to convict him if it found he intended to promote or assist in the felony theft but not the act clearly dangerous to human life. *Id*., at 294-95. Specifically, he complained the use of the term "the offense" was ambiguous. *Id*., at 294-95. The complained-of paragraph stated:

> Now, if you find from the evidence beyond a reasonable doubt that on or about June 23, 2009, in Harris County, Texas, [codefendant] and/or Roberto Carrillo, did then and there unlawfully, intentionally or knowingly commit or attempt to commit felony theft, and while in the course of and furtherance of the commission or attempted commission of felony theft, Roberto Carrillo did commit an act clearly dangerous to human life, to wit: shooting H. Canales with a deadly weapon, namely, a firearm and did thereby cause the death of H. Canales, and that the defendant . . . with the intent to promote or assist the commission of *the offense,* if any, solicited, encouraged, directed, aided or attempted to aid [codefendant] and/or Robert Carrillo to commit *the offense* . . . . [Emphasis in original].

*Id*., at 294.

Because Nava failed to object at trial, he was not entitled to reversal unless the record demonstrated egregious harm. *Id*., at 298. In its analysis, the Court of Criminal Appeals stated that, at most, the use of the term "the offense," created only an implication that the jury could misconstrue the term to refer to the underlying theft, but that common sense suggested the jurors would not have misread the charge because doing so would render the conspiracy-liability portions of the charge superfluous, and in any event the abstract instruction correctly required the State to prove that Nava intended to promote or assist the commission of felony murder. *Id*., at 298-99. Combined with the parties' vigorous dispute over whether Nava said, "Shoot him!"—which would

16

have been pointless if the participation in the underlying theft were all that mattered—the court concluded that the jury most likely understood the application paragraph in a manner consistent with the law. *Id*., at 302. The record, therefore, did not demonstrate egregious harm. *Id*.

*Analysis*

Here, Appellant claims the application paragraph was similarly misleading because of the use of the term "the offense." She claims the harm here, however, was egregious because in addition to the misleading charge the State emphasized the error by repeatedly misstating to the jury that it only need believe Appellant intended to promote or assist the underlying robbery to find her guilty of felony murder. She further contends that the second half of the charge paragraph—dealing with felony murder—failed to require that the act caused the death of Castanon. As to serious-bodily-injury murder, Appellant claims the charge did not require the jury to find she intended to assist in causing Castanon serious bodily injury and did not require it to find she assisted in committing an act clearly dangerous to human life or intended to assist in causing Castanon's death. The charge paragraph Appellant complains of read as follows:

## Count I

### Murder

If you find from the evidence beyond a reasonable doubt that on or about the 17th day of May, 2013, in El Paso County, Texas, the defendant, SONIA BAUTISTA, did then and there, either acting alone or as a party, with *intent* to promote or assist the commission of *the offense* by soliciting, encouraging, directing, aiding or attempting to aid Ricky Macias or Briana Garay, with *intent* to cause serious bodily injury to an individual, namely, Jose Castanon, commit an act clearly dangerous to human life, to wit: compressing Jose Castanon's neck with jeans, *that caused the death of* the said Jose Castanon; **or** did then and there, either acting alone or as a party, with intent to promote or assist the commission of *the offense* by soliciting, encouraging, directing, aiding, or attempting to aid Ricky Macias or Briana Garay, commit or attempt to commit the felony offense of Robbery, and while in the course of and in furtherance of the commission of said

17

offense, did then and there commit an act clearly dangerous to human life, to wit: compressing Jose Castanon's neck with jeans, and that the said Defendant used or exhibited a deadly weapon, to wit: jeans, during the commission of or immediate flight from said offense . . . . [Emphasis added].

As in *Nava*, nothing in the application paragraph expressly directs the jury to deliberate in a manner inconsistent with the law. *Nava*, 415 S.W.3d at 300. Further, as the State correctly points out, just as in *Nava*, the abstract portion of the jury charge correctly defined party liability:

A person is criminally responsible as a party to an offense if the offense is committed by her own conduct, or by the conduct of another for which she is criminally responsible, or both. Each party to an offense may be charged with the commission of the offense. A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, she solicits, encourages, directs or aids or attempts to aid the other person to commit the offense. Mere presence alone will not make a person a party to an offense.

Even assuming the implication of the jury misconstruing the charge language is as strong in this case as it was in *Nava*, the proper recitation of the law in the abstract portion minimized any error in the application paragraph. *Id*. Accordingly, we must review the state of the evidence and arguments of counsel to determine if the record demonstrates egregious harm. *Sanchez*, 393 S.W.3d at 803.

As noted, Appellant claims the State repeatedly mischaracterized the law regarding felony murder and party liability. Appellant points to voir dire during which the prosecutor stated a person can be convicted of murder under the felony murder rule even if she did not intend to kill the victim and even if she was not the individual who killed the victim. He followed up by stating, "So if you help your friend commit a felony, right, and during that felony, your friend commits an act clearly dangerous to human life that causes the death of someone, and you helped them during that felony, you can be convicted of felony murder." But this statement, while it could be

18

misconstrued as a misstatement of the law, is ambiguous; the prosecutor's statement "and you helped them during that felony" can also be interpreted as referring to the antecedent clause "your friend commits an act clearly dangerous to human life that causes the death of someone."   In that interpretation, the prosecutor would be correctly stating the law regarding felony murder.   *Nava*, 415 S.W.3d at 300.   Further, the prosecutor had correctly defined party liability moments before by stating that a person is guilty of an offense as a party if she intends to assist in the offense and does in fact assist in that particular offense.   Appellant also points to the prosecutor's statements during closing that "whether she meant to rob him—whether she herself—doesn't matter. If she knew that those two . . ." as an additional misstatement of the law.   Defense counsel objected before this statement was finished, and the trial court instructed the jury that it had the charge in front of it and it should recall the evidence it had heard.   Curative instructions generally cure any prejudicial effect of improper argument.   *Dinkins v. State*, 894 S.W.2d 330, 357 (Tex.Crim.App. 1995)(*citing McGee v. State*, 774 S.W.2d 229, 238 (Tex.Crim.App. 1989)).   The arguments of counsel cited by Appellant as improper only allow for an inference of theoretical, not actual, harm, and therefore do not weigh in favor of finding egregious harm.   *See Torres*, 543 S.W.3d at 414.

Finally, Appellant claims the evidence at trial pointed to Macias as the one who killed Castanon, and so therefore the alleged error in the application paragraph "was devastating to the defensive theory of the case."   While Appellant's testimony at trial was she and Garay had run out of the home while Macias and Castanon were still struggling—thus painting him as the sole actor in the killing—her video-recorded statement contradicted this portrayal.   In her video-recorded statement, Appellant admitted to striking Castanon with her fists and smashing the jar on his head while he was being strangled by Macias.   As to her defensive theory, it was, in essence,

she had not participated in the murder or the alleged robbery—but rather she had innocently entered the home and got caught up in the struggle against her will and fled at the earliest opportunity. The ambiguity in the instruction would not have affected her defensive theory because even if it were misconstrued by the jury, it still required the jury to find she intended to assist and did assist Macias or Garay in robbing Castanon, therefore rejecting her defensive theory. To qualify as egregious error, the error must deprive the defendant of a valuable right or vitally affect her defensive theory, which the record does not demonstrate. *Almanza*, 686 S.W.2d at 172. Based on the state of the evidence and the contested issues, the arguments of counsel, and the charge itself, the record does not demonstrate egregious harm from the ambiguity in the jury charge. Accordingly, Appellant's third, fourth, and fifth issues are overruled.

**Objected-to Jury-Charge Error**

In her sixth, seventh, and eighth issues, Appellant contends there was jury-charge error regarding the self-defense instructions. In Issue Six, Appellant claims the trial court erred in including in the charge portions the law of self-defense relating to the presumption of reasonableness that was not raised by the evidence. In Issue Seven, Appellant asserts the trial court erred in instructing the jury that if it found against her on the presumption of reasonableness it should find against her on the issue of self-defense. And in Issue Eight, Appellant claims the trial court erred in including the law of self-defense as it relates to deadly force in the jury charge. Appellant objected to these errors at trial.

### *Standard of Review*

As noted above, we review claims of jury-charge error by first determining whether an error exists in the charge. *Ngo*, 175 S.W.3d at 743. If we find error in the charge, we then

20

analyze that error for harm. *Middleton*, 125 S.W.3d at 453. The level of harm required for reversal depends on whether the defendant objected to the error at trial. *Almanza*, 686 S.W.2d at 171. If the defendant timely objected to the error, the error is analyzed under the "some harm" standard: the judgment may not be reversed unless the error was calculated to injure the rights of the defendant. *Id.* In deciding whether some harm occurred, the court reviews "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and . . . any other part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused." *Id.* at 171-74.

### *Applicable Law*

The duty of the trial court in charging the jury is to communicate to the jury each statutory definition that affects the meaning of an element of an offense. TEX.CODE CRIM.PROC.ANN. art. 36.14. When the application paragraph of a jury charge incorrectly applies the relevant penal law to the facts of a given case, it is erroneous. *Cortez*, 469 S.W.3d at 598. There is a higher need for defining terms that have a technical meaning when there is a risk that the jurors may arbitrarily apply their own definitions of the term. *Middleton*, 125 S.W.3d at 454.

Self-defense is an issue of fact to be determined by the jury. *Saxton v. State*, 804 S.W.2d 910, 913 (Tex.Crim.App. 1991). Section 9.31 of the Penal Code provides that an actor is justified in using force against another to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX.PENAL CODE ANN. § 9.31(a)(West 2011). The Penal Code also provides that an actor can be justified in using deadly force against another person if the actor would be justified under Section

21

9.31 in using force and the actor reasonably believes that deadly force is immediately necessary to protect the actor from the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of murder. TEX.PENAL CODE ANN. § 9.32(a)(West 2011). Under either section, the actor's belief that the force or deadly force was immediately necessary is presumed to be reasonable if the actor:

(1) knew or had reason to believe that the other was committing or attempting commit murder;

(2) did not provoke the other person against whom the force was used; and

(3) was not otherwise engaged in criminal activity.

TEX.PENAL CODE ANN. §§ 9.31(a); 9.32(b).

*Analysis*

Appellant complains that the application paragraph regarding self-defense improperly included the presumption of reasonableness because its inclusion effectively eliminated her theory of self-defense from the jury's consideration. The complained-of paragraph read as follows:

> You are further instructed, however, that if you believe from the evidence beyond a reasonable doubt, or if you believe beyond a reasonable doubt that the State has proven that the facts giving rise to the presumption of reasonable belief that force or deadly force was immediately necessary do not exist or that at the time and place in question JOSE CASTANON was not using or attempting to use unlawful force or deadly force against SONIA BAUTISTA or BRIANA GARAY, *or* that SONIA BAUTISTA or BRIANA GARAY was not justified in using force or deadly force, then you will find against the Defendant on her plea of self-defense or defense of a third person, and say by your verdict 'guilty' (Verdict Form 'A'). [Emphasis added].

The abstract portion of the charge laid out Sections 9.31 and 9.32 regarding self-defense verbatim. Appellant contends the presumption of reasonableness does not apply to an actor who had no reason to believe that the person against whom deadly force was used was attempting to commit murder, and also does not apply to an actor who used deadly force while otherwise engaged in

22

criminal activity, citing Section 9.32(b) and *Villarreal v. State*, 453 S.W.3d 429, 439 (Tex.Crim.App. 2015). Therefore, she claims, the trial court erred in failing to exclude the presumption from the charge because the charge instructed the jury to find against her if it found the circumstances that give rise to the presumption of reasonableness were lacking. But the end of the complained-of paragraph properly instructs the jury that if it finds the presumption did not apply, it still must find that Appellant was not justified in using force or deadly force, as indicated by the comma and use of "or" following the instruction on the presumption of reasonableness. Further, the paragraph dealing with self-defense immediately preceding the complained-of paragraph correctly instructed the jury that it was required to find Appellant not guilty if it believed she had a reasonable belief that force or deadly force was immediately necessary to protect herself or Garay from Castanon. As to the deadly force instruction, the trial court properly instructed the parties that absent agreement from them it would include the law of self-defense in its entirety and allow the parties to inform the jury which parts were applicable to the case, which they did. The record presented does not show error in the charge given to the jury. Accordingly, we do not reach the harm analysis. *Ngo*, 175 S.W.3d at 743. Appellant's sixth, seventh, and eighth issues are overruled.

## Improper Jury Argument

In her ninth issue, Appellant contends the State improperly argued to the jury that it could find her guilty if it believed she knew Macias and Garay were going to rob Castanon, and the trial court erred in overruling her objections to the State's improper arguments.

### *Standard of Review*

23

Permissible jury argument generally falls into one of four areas: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and, (4) pleas for law enforcement. *Coble v. State*, 871 S.W.2d 192, 204 (Tex.Crim.App. 1993)(*citing Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Crim.App. 1973)). Any argument outside of these enumerated areas is erroneous. *Id.* If an argument is determined to be error, that error is subject to a harm analysis. *Freeman v. State*, 340 S.W.3d 717, 728 (Tex.Crim.App. 2011). A non-constitutional error is reviewed to determine whether the defendant's substantial rights were affected by the improper argument. *Id.* To make that determination, the reviewing court balances the severity of the misconduct, any curative measures, and the certainty of conviction absent the misconduct. *Id.*

### *Analysis*

Appellant's complaint centers on the following portion of the State's closing arguments:

[STATE]: And the last thing I think is the most important—well, I don't know. The three of them, those are all important. The last one is whether she meant to rob him—whether she herself—doesn't matter. If she knew that those two—

[DEFENSE]: I'm going to object to that, Your Honor. It does require an intent to commit aggravated robbery so as to make her guilty of—

[COURT]: I just need a legal objection. Members of the jury, you have the Court's charge in front of you, and you'll recall the evidence you heard.

[STATE]: If she knew that they went there to rob him and she agreed to go along with it, that counts, okay? It's the same as the getaway driver. If you're the getaway driver, and you go and you park outside—

[DEFENSE]: I'm going to object, Your Honor. This is a misstatement of the facts and the law. The getaway driver is driving and she was in the backseat.

[COURT]: Overruled.

24

[STATE]: The getaway driver knows that his buddy is going inside to rob the store and he sits out there and he waits for his buddy to come out, that's robbery. Even if the—obviously the getaway driver himself is not committing the robbery, but he knows that his buddy is.

[DEFENSE]: Your Honor, once again, he drove the individual there.

[COURT]: The legal objection is?

[DEFENSE]: It's a misstatement of the law.

[COURT]: Overruled.

Appellant contends that the State mischaracterized the law of parties, creating a possible misperception amongst the jury that it only needed to find that she intended to rob Castanon to find her guilty of murder. In context, the State was providing a list during closing of factors it considered important—her intent to participate in the robbery being the third mentioned. The second factor emphasized by the State was that Appellant smashed the jar on Castanon's head while he was already on the floor, and the first was that she helped Macias assault him. Though perhaps unclearly stated, the State correctly described the law of parties regarding knowledge and intent to assist in the offense. TEX.PENAL CODE ANN. § 7.02(a)(2); *Beier*, 687 S.W.2d at 3. Further, the State's analogy to the "getaway driver" was also a reference to its analogy during voir dire regarding the law of parties, where the State explained that a getaway driver was also guilty of robbery even though his participation was limited to waiting outside and assisting the escape. Because Appellant was charged as a party and because Appellant claimed ignorance of Garay or Macia's intent to rob Castanon, these were proper jury arguments. *Coble*, 871 S.W.2d at 204. Accordingly, the trial court did not err in overruling Appellant's objections. Appellant's ninth issue is overruled.

**Ineffective Assistance of Counsel**

25

In her final issue, Appellant contends the trial court abused its discretion in refusing to grant her motion for new trial based on ineffective assistance of counsel. Specifically, she asserts her counsel failed to interview potential defense witnesses, failed to adequately prepare them to testify, and failed to call additional mitigation witnesses who were available to testify.

### Standard of Review

A trial court's decision to deny a motion for new trial is reviewed for abuse of discretion. *Riley v. State*, 378 S.W.3d 453, 457 (Tex.Crim.App. 2012). A trial court is granted broad discretion in assessing the credibility of witnesses and weighing the evidence when considering a motion for new trial. *Messer v. State*, 757 S.W.2d 820, 824 (Tex.App.--Houston [1st Dist.] 1988, pet. ref'd). We will reverse for abuse of discretion only if no reasonable view of the record supports the trial court's ruling. *Webb v. State*, 232 S.W.3d 109, 112 (Tex.Crim.App. 2007). In applying this deferential review, we must view the evidence in the light most favorable to the trial court's ruling and must uphold the ruling if it is within the zone of reasonable disagreement. *Riley*, 378 S.W.3d at 457.

### Applicable Law

A criminal defendant is entitled to be represented by effective, competent counsel under the Sixth Amendment to the United States Constitution. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). When challenging the effectiveness of counsel, an appellant must show that there was no plausible professional reason for a specific act or omission by counsel. *Bone v. State*, 77 S.W.3d 828, 836 (Tex.Crim.App. 2002). We indulge a strong presumption that counsel's actions were professional, and any allegation of ineffectiveness must be firmly founded in the record. *Thompson v. State*, 9 S.W.3d 808, 813

26

(Tex.Crim.App. 1999). If counsel was ineffective, we must also determine whether there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Id*., at 812; *Adekeye v. State*, 437 S.W.3d 62, 73 (Tex.App.--Houston [14th Dist.] 2014, pet. ref'd). This two-prong test need not be analyzed in any particular order: appellant's failure to satisfy either prong defeats a claim of ineffective assistance of counsel. *Garcia v. State*, 57 S.W. 3d 436, 440 (Tex.Crim.App. 2001)(*citing Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069).

Counsel has a duty to make an independent investigation of the facts of a case. *Ex parte Welborn,* 785 S.W.2d 391, 396 (Tex.Crim.App. 1990). A decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Wiggins v. Smith,* 539 U.S. 510, 521–22, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). When an ineffective assistance of counsel claim is based on an uncalled witness, the appellant must show that the witness would have been available to testify and that his testimony would have benefitted the defense. *Ex parte White*, 160 S.W.3d 46, 52 (Tex.Crim.App. 2004).

*Analysis*

Appellant's trial counsel testified at the hearing on her motion for new trial. He testified that he met with Appellant between fifteen and twenty times prior to trial, and in some of those meetings he discussed their strategy for the punishment phase if she were to be found guilty. He stated that he asked her to gather various witnesses that would testify on her behalf and to bring them to court. He claimed he asked her to have them get in touch with him if necessary to discuss potential issues. He also testified that he spoke with the witnesses themselves before the punishment phase regarding their testimony. Counsel stated part of his strategy was to pack the

27

courtroom with as many supporters as possible and to strategically select anywhere between two to seven witnesses to testify. Those selected would not be available to sit in the courtroom as supporters because the Rule would have been invoked. He stated he told Appellant what characteristics were helpful and what testimony he desired from the witnesses and asked for her choices based on that criteria. Ultimately, the defense called Appellant's former employer, a long-time family friend, Appellant's husband, and Appellant herself. Appellant's former employer testified as to her good performance as an employee and to her friendly demeanor. The family friend testified that she loved her like a daughter, that this crime was totally out of character, and Appellant was a good person. Appellant's husband—a mechanic with the United States Army—testified to how they first met, Appellant was a kind and generous person, and a wonderful wife and mother. Appellant took the stand and discussed her marriage, her love for her husband, her son, and her deep regret over what happened to Castanon. Counsel testified that although he initially wanted Appellant's mother to testify, Appellant advised against it and satisfied him that she would not be a good witness. He stated that Appellant's grandparents were not called for the same reason. At the hearing on the motion for new trial, Appellant and her husband both testified that additional people from Appellant's workplace and from her church were willing to come forward to testify on her behalf. They did not say what these witnesses would testify to.

The record before us demonstrates that counsel explained his strategic decisions regarding the witnesses he called and that he spoke with them before the punishment phase about their testimony. He also explained his strategic thinking regarding the witnesses he kept in the courtroom to show that Appellant had strong support. The record does not demonstrate that counsel was ineffective for failing to interview or call additional witnesses or what, if anything,

what these additional witnesses could have provided to the jury or modified the punishment verdict. Even if counsel's actions were found ineffective, the record does not give any indication that there is a reasonable probability that her sentence would have been different. As Appellant recognizes in her brief, it is speculative at best whether additional character witnesses would have favorably influenced the jury's assessment of punishment, and mere speculation does not demonstrate a probability that the outcome would have been substantially different. *Thompson*, 9 S.W.3d at 813. Accordingly, based on the record before us, we cannot say that the trial court abused its discretion in finding no merit to Appellant's claim of ineffective assistance of counsel. *Riley*, 378 S.W.3d at 457. Appellant's tenth issue is overruled.

## CONCLUSION

Having overruled Issues One through Ten, the judgment of the trial court is affirmed.

October 10, 2018
                                        YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

29