COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JERRY LYNN MCGAVITT, | § | |
| | | No. 08-17-00168-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 34th District Court |
| THE STATE OF TEXAS, | § | |
| | | of El Paso County, Texas |
| Appellee. | § | |
| | | (TC# 20140D05274) |
| | § | |

# **O P I N I O N**

Jerry Lynn McGavitt was convicted of murder and sentenced to sixty years' confinement with the Texas Department of Criminal Justice Institutional Division.   In five issues, McGavitt contends:   (1) the trial court erroneously defined the term "intentionally" in the abstract portion of the jury instructions, allowing the jury to convict him of murder without concluding it was his conscious objective or desire to promote or assist in the victim's murder; (2) the trial court erred in admitting the photos of the victim's body because they were more prejudicial than probative; (3) the evidence was legally insufficient to support his conviction under the law of parties; (4) the trial court erred in denying his motion for mistrial because an impartial verdict could not be reached after the State's expert witness testified to a different conclusion than stated in the expert's report, which significantly hampered his defense; and (5) the trial court erred in denying his motion to

suppress the video recorded statement because he never received *Miranda* warnings.   We affirm.

**BACKGROUND**

On September 5, 2014, employees of the El Paso Electric Company were performing work in the basement of an abandoned building in downtown El Paso when they discovered a burned and decomposing body.   Police responded to the scene and found what was later identified as the body of Geraldo Luna.   The deceased appeared to have been restrained and violently beaten.   His arms were bound behind his back, his feet were bound, his mouth had been gaged, and a ligature had been wrapped around his neck.   He had broken bones in his arms and legs and his skull had been smashed in.   The deputy medical examiner ruled the death a homicide by unspecified means, due in part to the difficulty in determining the exact cause of death from a burned and partially decomposed body.

Officers initially identified two suspects, Jesus Barraza and Thomas McNair, each of whom had left identifying documents at the scene.   A third individual, Marcus Adkins, was identified through fingerprint analysis.   Through interviews, the police were able to identify the Appellant, Jerry Lynn McGavitt, as having been involved.

On September 9, 2014, plainclothes officers made contact with McGavitt while he was walking with a companion on Myrtle Street in downtown El Paso.   He was cooperative and willing to speak with detectives but was not told what case was being investigated or that he was suspected of a crime.   The officers contacted Sergeant David Flores of the El Paso Police Department, who was investigating the case, and he came to Myrtle street to meet with McGavitt. Upon arriving, Sgt. Flores thanked McGavitt for his cooperation, to which McGavitt responded, "[n]o problem, I'll speak to you guys."   Because neither McGavitt nor his companion had a

2

vehicle, the plainclothes officers drove McGavitt to the police station.

Once at the station, McGavitt waited in the common area of the crimes-against-persons office. Sgt. Flores informed McGavitt he was not in custody and walked with him to an unlocked interview room off of the common area. In the interview room, Flores began by telling McGavitt the police were investigating a case involving a dead body and asked if he could answer a few questions. McGavitt agreed, and Flores read him his *Miranda* warnings. Flores later testified that regardless of whether or not a suspect is in custody, whenever he interviews a suspect he reads each interviewee the *Miranda* warnings without exception. The two briefly engaged in small talk, and Flores reminded Appellant again that he was investigating a case involving a dead body found in the downtown area. McGavitt volunteered that he had "heard about it on the news." Flores asked him if he had any information to give, and McGavitt responded that he did, but added, "it wasn't me that did it." Flores asked McGavitt if he would be willing to allow the interview to be recorded and he responded affirmatively.

At the beginning of the recording, McGavitt is read his *Miranda* warnings. McGavitt proceeded to state that he, Barraza, McNair, and a third person, Brittany Stewart, had been living in the abandoned Dollar Plus building on 101 North Mesa Street and went there the afternoon of the murder. The victim, Geraldo Luna, subsequently entered through the front of building by climbing a fenced-off entryway. McGavitt noted Luna had done this in broad daylight, which he pointed out could have jeopardized he and his companions' ability to remain in the abandoned building. McGavitt claimed he did not know Luna personally and told Flores that McNair and Barraza harbored animosity for Luna for reasons he did not understand. According to McGavitt, an altercation started between McNair and Luna when Luna jumped the fence because he had

3

potentially exposed the fact that they were squatting in the building. The altercation proceeded into the basement of the building. McGavitt claimed that once they were in the basement Barraza told him to hold Luna down. McGavitt complied and wrapped his arms around Luna and both men fell to the ground. With McGavitt still holding onto Luna, Barraza started hitting Luna with a rubber mallet. McGavitt claimed Barraza struck Luna in the face over a dozen times with the rubber mallet. While he was wildly swinging the mallet, Barraza accidentally hit McGavitt in the face, causing him to release his grip on Luna and run upstairs. McGavitt told Flores he started bleeding and had to use a shirt to stop the blood flow. Sgt. Flores asked about pooled blood the police had located in the basement and McGavitt stated that some of the pooled blood downstairs was his own, while some belonged to Luna.

McGavitt returned downstairs and saw McNair and Barraza beating Luna with metal pipes, noting that Barraza had the bigger of the two pipes. They were hitting Luna in the stomach and chest and he was screaming as he was being struck. McGavitt saw Luna standing as he was being beaten. Barraza demanded Luna lie down on the bed but he did not respond. The others asked Luna if he would resist while they bound his hands and feet and he replied he would not. McGavitt stated he and the others then bound Luna's hands and feet near the bed. McGavitt told Sgt. Flores that he personally tied Luna's hands behind his back with string McGavitt had found lying around in the basement. He claimed McNair used a bungee cord around Luna's neck and someone gagged him. Luna was now placed lying face-up on the bed, bound and gagged.

McGavitt stated Barraza and McNair begin hitting Luna with the pipes again, this time continuously for a sustained period. McGavitt explained to Flores that at some point during this second beating McGavitt stopped believing Luna was alive. Sgt. Flores interrupted, noting police

4

had found a third pipe in the basement and asked whether McGavitt had joined in on the beating out of anger for being struck in the face with the mallet. McGavitt denied joining in, asserting he was not angry about getting hit in the face. He stated that while Barraza and McNair were still beating Luna, Brittany and he walked up the stairs to the main floor. Barraza and McNair followed shortly thereafter, and the four agreed they needed to get out of the building. McGavitt stated they all walked over to The Tap, a bar in the nearby downtown area, and sat together on a bench in front of the bar. He stated McNair and Barraza began discussing how to dispose of the body but told Flores that he and Brittany did not participate in the conversation. McGavitt claimed the third suspect, Marcus, walked up and joined them all shortly thereafter. At McNair's suggestion, Marcus, McNair, and Barraza walked back to the abandoned building to burn the body. McGavitt claimed they utilized lighter fluid that had been abandoned in the alley. The three then returned to The Tap, where McGavitt claims McNair told him they had successfully burned the body. Sgt. Flores asked McGavitt why he had helped the others. McGavitt initially stated he did not know why he had helped, then claimed he had done so because he was scared he would have been next if he refused to help. McGavitt was arrested by Sgt. Flores shortly after the end of the interview.

McGavitt was indicted for murder and for altering or destroying a human corpse with intent to impair its availability as evidence. He moved to suppress the recorded interview on the grounds that he had been in custody when he was taken to the police station and claimed he had given incriminating statements in the initial unrecorded interview and denied that Sgt. Flores had provided him with *Miranda* warnings before that discussion. The trial court denied the motion to suppress and the case proceeded to trial. The jury found McGavitt guilty of murder as charged in

5

the indictment and sentenced him to sixty years' in the Texas Department of Criminal Justice Institutional Division.[1]  This appeal followed.

## DISCUSSION

McGavitt raises five issues on appeal.  In Issue One, he contends the trial court erroneously defined the term "intentionally" in the abstract portion of the jury instructions, allowing the jury to convict him of murder without concluding it was his conscious objective or desire to promote or assist in Luna's murder as was required to convict him under the law of parties.  In Issue Two, he asserts the photos of Luna's charred and deformed body were more prejudicial than probative because the evidence presented at trial showed he did not participate in beating Luna, thus rendering their probative value nonexistent.  In Issue Three, McGavitt contends the evidence to show he was acting with Barraza and McNair as part of a common design to murder Luna was legally insufficient to support his conviction under the law of parties.  In Issue Four, McGavitt argues the trial court erred in denying his motion for mistrial because an impartial verdict could not be reached after the State's expert witness testified that blood found on McGavitt's shirt was a mixture of two individuals' blood instead of inconclusive as was stated in the report.  He asserts this was devastating to his defensive strategy because he could no longer contend he was an unwilling participant due to the implication that the blood mix resulted from his willing participation.  In Issue Five, McGavitt contends the trial court erred in denying his motion to suppress the recorded interview because at some point between his initial contact with plainclothes officers and the recorded interview, the interaction had become custodial, and therefore the initial incriminating statements along with the subsequent recorded statements should

---

[1] The State later dismissed the charge for altering or destroying a human corpse with intent to impair its availability as evidence.

6

have been suppressed due to his never having received *Miranda* warnings. Because we must render a judgment of acquittal if the evidence is legally insufficient to convict McGavitt of murder, we will address Issue Three first.[2]

## Sufficiency of the Evidence

In his third issue, McGavitt challenges the legal sufficiency of the evidence to support his conviction for murder, asserting the State failed to demonstrate he promoted or assisted the others in Luna's murder.

### *Standard of Review*

Under the Due Process Clause of the U.S. Constitution, the State is required to prove every element of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In *Brooks v. State*, the Texas Court of Criminal Appeals held that the only standard a reviewing court should apply when examining the sufficiency of the evidence is the legal sufficiency standard articulated in *Jackson*, which requires deference to be given to the jury's credibility and weight determinations. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). The critical inquiry in a legal sufficiency challenge, as set out in *Jackson*, is whether the evidence in the record could reasonably support a conviction of guilt beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007). When reviewing the legal sufficiency of the evidence, we must view all of the evidence in the light most favorable to the verdict to determine whether any rational juror could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim.App. 2005). Additionally, we treat circumstantial evidence as being

---

[2] *See Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App. 2000)("If the evidence is insufficient to support [the defendant's] conviction, the remedy is acquittal.").

equally probative as direct evidence. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004)(*citing Templin v. State*, 711 S.W.2d 30, 33 (Tex.Crim.App. 1986)). Therefore, a lack of direct evidence is not dispositive on the issue of the defendant's guilt; guilt may be established by circumstantial evidence alone. *Id.*, at 49 (*citing Miles v. State*, 165 S.W. 567, 570 (Tex.Crim.App. 1914)). We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240.

We bear in mind that the trier of fact is the sole judge of the weight and credibility of the evidence, and we must presume that the fact finder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Dobbs v. State*, 434 S.W.3d 166, 170 (Tex.Crim.App. 2014)(*citing Jackson*, 443 U.S. at 319). A reviewing court may not reevaluate the weight and credibility of the evidence or substitute its judgment for that of the fact finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010)(*citing Dewberry v. State*, 4 S.W.3d 735, 740 (Tex.Crim.App. 1999)). Our only task under this standard is to determine whether, based on the evidence and reasonable inferences drawn therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

### *Applicable Law*

Under the Texas Penal Code, a person commits the offense of murder if he: (1) intentionally or knowingly causes a person's death; or (2) intends to cause a person serious bodily

injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX.PENAL CODE ANN. § 19.02(b)(1), (2).

Under Texas law, a defendant may be held criminally responsible as a party for an offense committed by another under certain enumerated circumstances. TEX.PENAL CODE ANN. § 7.02. One such circumstance is when the defendant—acting with intent to promote or assist the commission of the offense—solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX.PENAL CODE ANN. § 7.02(a)(2). Evidence is sufficient to support a conviction under this section where the defendant is physically present at the commission of the offense and encourages the commission of the offense by either words or other agreement. *Beier v. State*, 687 S.W.2d 2, 3 (Tex.Crim.App. 1985)(*citing Tarpley v. State*, 565 S.W.2d 525 (Tex.Crim.App. 1978)). There must be evidence of intentional participation; mere presence alone is insufficient. *Id*., at 4. In determining whether the defendant participated as a party, the court may look to events occurring before, during, and after the commission of the offense, and may rely on actions of the defendant evincing an understanding and common design to do the prohibited act. *Id*., at 4 (*citing Medellin v. State*, 617 S.W.2d 229 (Tex.Crim.App. 1981)); *Reed v. State*, 550 S.W.3d 748, 765 (Tex.App.—Texarkana 2018, no pet.). That each party was doing some part of the common purpose is sufficient to show the parties were acting together. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex.Crim.App. 1985).

### *Analysis*

McGavitt contends his repeated denials in the recorded interview that he helped beat Luna showed he did not intend to promote or assist the others in causing Luna's death. He asserts no evidence exists to show he participated in a common design to murder Luna, and therefore the

9

jury's verdict was not based on evidence but rather improper speculation. He also asserts the State failed to establish the *corpus delicti* of the murder, contending, as he puts it, the deputy medical examiner's conclusion that the death was a homicide by unspecified means was "very scant," and therefore insufficient to establish the body of the crime. We disagree.

As the State correctly points out, the requisite culpable mental state is generally proved circumstantially. *See Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App. 1991), *overruled on other grounds by Janecka v. State*, 937 S.W.2d 456, 460 (Tex.Crim.App. 1996)("Indeed, mental culpability is of such a nature that it generally must be inferred from the circumstances under which a prohibited act or omission occurs."). The jury was entitled to examine events occurring before, during, and after the murder and rely on McGavitt's actions that show an understanding and common design to murder Luna. *Beier*, 687 S.W.2d at 4. And from his confession the jury heard that McGavitt grabbed Luna as the altercation started and using his weight pulled Luna to the ground and held him in place while Barraza struck him over a dozen times in the face with a mallet. From his testimony, the jury also heard that McGavitt only stopped holding Luna in place because he himself was accidentally struck with the mallet by Barraza, an act that caused immediate and serious bleeding from McGavitt. He went upstairs to get a shirt to stop his own bleeding from the blow, and then returned downstairs and continued to assist the others by helping to bind up an already beaten Luna, thus rendering the victim immobile and defenseless. He watched Barraza and McNair beat Luna continually until, by his own admission, he believed Luna was dead. The four of them then decided it was wise to leave the building they had been occupying and left together to a local bar. Under the law of parties, the jury was required to find that (1) McGavitt, (2) acting with the intent to promote or assist the commission of murder, (3) solicited, encouraged,

10

directed, aided, or attempted to aide McNair or Barraza, or both, murder Luna in pursuit of that common goal. TEX.PENAL CODE ANN. §§ 19.02(b)(1), (2); 7.02(a)(2). The jury here could have made that finding based solely on McGavitt's own admissions regarding his actions during and after the commission of the offense. Accordingly, the evidence was legally sufficient for a rational juror to find McGavitt promoted or assisted in Luna's murder as part of a common design.

As to McGavitt's contentions regarding the *corpus delicti* rule, that rule, as applies to murder, is satisfied where the evidence other than the defendant's extrajudicial confession shows (1) the death of a human being (2) caused by the criminal act of another. *Fisher v. State*, 851 S.W.2d 298, 303 (Tex.Crim.App. 1993)(*citing Jackson v. State*, 652 S.W.2d 415, 419 (Tex.Crim.App. 1983)). That is, all that must be shown by the non-confession evidence is that Luna was murdered by someone. *Id.* Here, that was established by the deputy medical examiner's testimony that the cause of Luna's death was homicide by unspecified means, a fact also reflected in her formal autopsy report that was entered into evidence. Although McGavitt asserts this evidence alone was insufficient, or insufficiently conclusive, he has cited no authority to support this contention and we have found none. Accordingly, McGavitt's third issue is overruled.

**Jury Charge Error**

In his first issue, McGavitt argues the trial court committed reversible error in defining the term "intentionally" only in the abstract portion of the jury instructions, thus impermissibly lowering the State's burden of proof and allowing the jury to convict him without finding he intentionally promoted or assisted the others in causing Luna's death.

***Standard of Review***

11

We review claims of jury-charge error by first determining whether an error exists in the charge. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). In examining a charge for possible error, we examine the charge as a whole instead of as a series of isolated and unrelated statements. *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex.Crim.App. 2012). If we find error in the charge, we then analyze that error for harm. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex.Crim.App. 2003). The level of harm required for reversal depends on whether the defendant objected to the error at trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(Opn. on reh'g). If the defendant timely objected to the error, the error is analyzed under the "some harm" standard: the judgment may not be reversed unless the error was calculated to injure the rights of the defendant. *Id*. In deciding whether some harm occurred, the court reviews the degree of harm in light of the entire jury charge, the state of the evidence, the argument of counsel, and any other part of the record as a whole which may illuminate the actual, not just theoretical, harm to the accused. *Id.* at 171-74.

### *Applicable Law*

As noted above, a person commits the offense of murder if he intentionally or knowingly causes a person's death or intends to cause a person serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX.PENAL CODE ANN. § 19.02(b)(1), (2). A person acts intentionally with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. TEX.PENAL CODE ANN. § 6.03(a). A person acts knowingly with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exit. TEX.PENAL CODE ANN. § 6.03(b). A person acts

12

knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id*. The offense of murder requires that the culpable mental state accompany the *result* of the conduct, rather than the *nature* of the conduct, and a murder charge that defines intentionally and knowingly as they relate to both the nature and the result of conduct is error. *Wallace v. State*, 763 S.W.2d 628, 629 (Tex.App.—San Antonio 1989, no pet.). Under the law of parties, a person is criminally responsible for the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX.PENAL CODE ANN. § 7.02(a)(2).

## *Analysis*

McGavitt asserts the definition of "intentionally" given by the trial court allowed the jury to convict him based on his intentional conduct in the struggle with Luna rather than, as was required, on his intent to cause the result—Luna's death. The trial court defined the culpable mental state of "intentionally," as related to the conduct elements involved in murder, as follows:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

McGavitt objected to this definition at trial, proposing instead his alternative definition:

> A defendant acts with intent to promote or assist in the commission of an offense when it is his conscious objective or desire to promote or assist in the commission of the offense.

McGavitt cites *Peek v. State* to support his contention that trial court's definition was erroneous. *Peek v. State*, 494 S.W.3d 156, 163 (Tex.App.—Eastland 2015, pet. ref'd).

*Peek* does not support this contention. In *Peek*, the defendant and two associates had been caught driving with sixteen grams of methamphetamine. *Peek*, 494 S.W.3d at 159–60. The defendant was charged as a party with the crime of possession of methamphetamine with intent to

13

deliver in a drug-free zone. *Id.*, at 159. That offense focused on the nature of the defendant's conduct, i.e., possessing a controlled substance with the intent to deliver it, which is punishable without regard to the result of his conduct. *Id*., at 162. The defendant contended the trial court failed to define "intentionally" in terms of the result of his conduct in the abstract portion of the charge and failed to apply a result-of-conduct definition to the law of parties. *Id.*, at 162. This, he asserted, allowed the jury to convict him for merely driving the vehicle without finding he possessed the conscious intent to promote or assist in the possession of methamphetamine with the intent to deliver. *Id*., at 163. The definition supplied by the trial court was, "[a] person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in a conduct." *Id*. In rejecting his argument, the court held the trial court "correctly charged the jury on the culpable mental state: [Defendant] must have acted with the 'intent' to promote or assist the commission of the charged offense." *Id*., at 163.

Here, the definition provided by the trial court is identical to the language used in *Peek* with the exception that it emphasizes the result of the defendant's conduct rather than the nature of his conduct. That is precisely what was required. *See Cook v. State*, 884 S.W.2d 485, 491 (Tex.Crim.App. 1994)(holding that murder is a result-of-conduct offense and a trial court errs in not limiting the culpable mental states to the result of the defendant's conduct). Further, the abstract portion of the jury instructions instructed the jury that under the law of parties:

> A person who does not by his own conduct commit an offense may nonetheless be criminally responsible for the conduct of another person. A person is criminally responsible for an offense committed by the conduct of another if, acting with *intent* to promote or assist the commission of the offense, he encourages, aids, or attempts to aid the other person to commit the offense.

> To prove that the defendant is guilty of an offense committed by the conduct of another, the state must prove, beyond a reasonable doubt, three elements. The

14

elements are that—

1. The other person committed the offense;

2. The defendant encouraged, aided, or attempted to aid the other person to commit the offense; and

3. The defendant acted with the *intent* to promote or assist in the commission of the offense by the other person.   [Emphasis added].

This instruction tracks the language of the statute regarding the law of parties and properly informed the jury regarding the State's burden of proof.   *See* TEX.PENAL CODE ANN. § 7.02(a)(2). Because the trial court correctly defined the culpable mental state as accompanying the result of the conduct, rather than the nature of the conduct, and properly defined the State's burden under the law of parties, the jury instructions were not erroneous.   *Wallace*, 763 S.W.2d at 629. Accordingly, McGavitt's first issue is overruled.

## Admission of Crime Scene Photographs

In his second issue, McGavitt asserts the photos of Luna's charred and deformed body were more prejudicial than probative because the evidence presented at trial showed he did not participate in beating the victim, thus rendering their probative value nonexistent.

### *Standard of Review*

"The admissibility of a photograph is within the sound discretion of the trial judge." *Williams v. State*, 958 S.W.2d 186, 195 (Tex.Crim.App. 1997).   A photograph is generally admissible if verbal testimony as to matters depicted in the photograph is also admissible.   *Gallo v. State*, 239 S.W.3d 757, 762 (Tex.Crim.App. 2007)(*citing Williams*, 958 S.W.2d at 195).   Thus, if verbal testimony is relevant, so are photographs depicting the matters testified to.   *Id*., at 762. A photograph is relevant if it has "any tendency to make the existence of any fact that is of

15

consequence to the determination of the action more probable or less probable than it would be without the evidence." [Internal quotations omitted]. *Flores v. State*, 299 S.W.3d 843, 857 (Tex.App.—El Paso 2009, pet. ref'd)(*citing* TEX.R.EVID. 401). The victim's identity and the manner and means of death are facts of consequence to the determination of an action. *Id*. Accordingly, a photograph of the injuries a defendant inflicted on the victim is evidence that is relevant to the jury's determination. *Salazar v. State*, 38 S.W.3d 141, 151–53 (Tex.Crim.App. 2001); *see also Santellan v. State*, 939 S.W.2d 155, 172 (Tex.Crim.App. 1997)(recognizing that autopsy photos are generally admissible unless they depict mutilation of the victim caused by the autopsy itself). We review a trial court's decision to admit photographs into evidence for abuse of discretion and that decision will only be disturbed on appeal if it falls outside the zone of reasonable disagreement. *Young v. State*, 283 S.W.3d 854, 874 (Tex.Crim.App. 2009).

### *Applicable Law*

Relevant evidence may be excluded when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX.R.EVID. 403. Rule 403 favors the admission of relevant evidence and carries with it a presumption that relevant evidence will be more probative than prejudicial. *Gallo*, 239 S.W.3d at 762, (*citing Williams*, 958 S.W.2d at 196). A court may consider several nonexclusive factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. *Id*. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Williams*, 958 S.W.2d at 196. A court must also consider the

16

availability of other means of proof and the circumstances unique to each individual case. *Gallo*, 239 S.W.3d at 762. Additionally, a court should consider whether the body has been altered since the crime in a way that might enhance the gruesomeness of the photographs to the accused's detriment. *Flores*, 299 S.W.3d at 858 (*citing Reese v. State*, 33 S.W.3d 238, 241 (Tex.Crim.App. 2000)).

*Analysis*

Here, McGavitt contends the trial court's decision to admit the photographs of Luna's body was an abuse of discretion because the evidence at trial did not implicate him in the beating of Luna; he therefore concludes the photos of Luna's wounds and the pipes nearby were not probative of the manner and means of death. He also contends the photos were highly inflammatory because of the gruesome nature of the charred body.

As already noted, a visual image of the injuries sustained by a victim are relevant to a jury's determination, and it is uncontested that the complained of photographs depict those injuries sustained by Luna. *Salazar*, 38 S.W.3d at 151–53. Accordingly, our only task is to determine whether the trial court abused its discretion in determining the probative value of the photos was not substantially outweighed by the danger of unfair prejudice. *Gallo*, 239 S.W.3d at 762. The photos of Luna's burned body were indeed grim, but that alone does not make them inadmissible. In *Chamberlain v. State*, the Court of Criminal Appeals recognized that while photographs may be gruesome and depict the disagreeable realities of the crime committed, "it is precisely because they depict the reality of [the] offense that they are powerful visual evidence, probative of various aspects of the State's case." *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex.Crim.App. 1999). Accordingly, McGavitt's assertion that the photos were highly inflammatory merely because they

17

were unpleasant to behold is insufficient for us to find an abuse of discretion in admitting them. Their gruesomeness results only from the actions of the murderers themselves, who burned the body in order to impair its availability as evidence.   Further, McGavitt's contention that the photos are not probative of the manner and means of Luna's death is inaccurate.   The complained-of photos—State's Exhibits 85, 88, and 92—depict several angles of the burned body, the pipes used to murder Luna that were left next to his body, and the bungee cord wrapped around Luna's neck. Photographs showing the injuries sustained by the victim are probative of the manner and means of his death and are relevant to the jury's determination.   *Salazar*, 38 S.W.3d at 151–53.   Because McGavitt has not shown how the probative value of these photos was substantially outweighed by the danger of unfair prejudice, we cannot conclude the trial court abused its discretion in admitting them.   Issue Two is overruled.

## Motion for Mistrial

In his fourth issue, McGavitt contends the trial court erred in denying his motion for mistrial.   Specifically, he asserts the jury could not render an impartial verdict because the State's expert witness offered an opinion differing from that in the witness' report, creating a conflict and hopelessly confusing the jury.   He also contends it was devastating to his defense because it prevented him from pursuing the theory that he was an unwilling participant in the murder.

### *Standard of Review*

We review a trial court's ruling on a motion for mistrial for abuse of discretion.   *Archie v. State*, 221 S.W.3d 695, 699 (Tex.Crim.App. 2007).   We must uphold the trial court's ruling if it is within the zone of reasonable disagreement.   *Id*., (*citing Wead v. State*, 129 S.W.3d 126, 129 (Tex.Crim.App. 2004)).   "Only in extreme circumstances, where the prejudice is incurable, will

a mistrial be required." [Internal quotations omitted]. *Id.*, (*quoting Hawkins v. State*, 135 S.W.3d 72, 77 (Tex.Crim.App. 2004)).

## *Applicable Law*

An expert witness may give opinion testimony based on scientific knowledge if it will help the trier of fact understand the evidence or determine a fact in issue. TEX.R.EVID. 702. The party offering the expert's opinion must demonstrate by clear and convincing evidence that the proof is reliable, and the trial court must determine whether the evidence is sufficiently reliable and relevant to assist the jury. *Jackson v. State*, 17 S.W.3d 664, 670 (Tex.Crim.App. 2000). Reliability can be demonstrated by showing: (1) the validity of the underlying scientific theory; (2) the validity of the technique applying the theory; and (3) proper application of the technique on the occasion in question. *Id.*, (*citing Kelly v. State*, 824 S.W.2d 568, 573 (Tex.Crim.App. 1992).

## *Analysis*

Here, the State's expert witness was the DNA-section supervisor and technical leader for the Texas Department of Public Safety. McGavitt contends the DNA expert rendered a different conclusion from that reached in his report when he opined that blood found on McGavitt's shirt was a mixture, instead of "inconclusive," as the report stated. During his testimony, the DNA expert explained that the lab could not get a DNA profile of Luna because the body had been burned and had decayed over several weeks before being discovered. He stated that several items found at the crime scene had blood belonging to the same unknown male, but due to the lab's inability to profile Luna's blood it could not be said whether the unknown male's blood was Luna's. He also stated that the lab was able to conclude with a reasonable degree of scientific

19

certainty that blood found on a pair of shorts belonged to McGavitt.[3]   He then testified that blood was also found on a shirt belonging to McGavitt, but that it was "insufficient for interpretation," meaning there was a mixture of DNA present but at such small quantities that the lab could not conclude whose blood it might be.   On cross-examination, McGavitt noted that the report stated the blood from the shirt was inconclusive and asked the witness why he had stated it was a mixture. He responded that based on his review of the report and his own experience and technical knowledge, the blood was actually "insufficient mixture data present for comparison."   McGavitt then moved for a mistrial, which the trial court denied.

McGavitt contends this testimony was confusing to the jury, mainly because it implied that the "mixture" meant the blood belonged to both McGavitt and Luna.   He asserts this also negated his defensive theory that he was an unwilling participant.   But as noted above, an expert witness may give opinion testimony based on scientific knowledge if it is reliable and will help the trier of fact.   TEX.R.EVID. 702; *Jackson*, 17 S.W.3d at 670.   The DNA expert's testimony was helpful to the jury in assisting them to understand whom the blood belonged to that was found on various objects at the crime scene.   And far from being confusing, the state's expert witness made clear that his testimony was the mixture was so low-level that it was impossible to determine the source. The expert also testified that he had reviewed the data and was basing his opinion on his own experience and technical knowledge as the DNA-section supervisor and technical leader.   Based on the record, the trial court did not abuse its discretion in concluding the expert's testimony was reliable and relevant in assisting the jury's determination and thus in denying McGavitt's motion for mistrial.   Issue Four is overruled.

---

[3] The expert testified that the odds the blood did not belong to McGavitt was approximately 1 in 3.081 quintillion.

**Motion to Suppress Recorded Statement**

In his final issue, McGavitt contends the trial court erred in denying his motion to suppress the recorded interview with Sgt. Flores because at some point between his initial contact with plainclothes officers and the recorded interview the interaction had become custodial, and therefore the initial incriminating statements along with the subsequent recorded statements should have been suppressed due to his never having received *Miranda* warnings.

*Standard of Review*

We review a trial court's ruling on a motion to suppress evidence for abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex.Crim.App. 2002). In doing so, we "afford almost total deference to the trial court's determination of historical facts" when those facts are supported by the record, and we will uphold the trial court's decision if it is correct under any theory of law applicable to the case. *State v. Stevens*, 235 S.W.3d 736, 739–40 (Tex.Crim.App. 2007); *see Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). Where, as here, the trial court does not make explicit findings of fact, we "review the evidence in a light most favorable to the trial court's ruling" and "assume that the trial court made implicit findings of fact supported in the record that buttress its conclusion." *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex.Crim.App. 2000). Mixed questions of law and fact, or "ultimate facts," are reviewed *de novo*, provided the trial court did not resolve them based on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997).

*Applicable Law*

"Law enforcement and citizens engage in three distinct types of interactions: (1) consensual encounters; (2) investigatory detentions; and (3) arrests." *State v. Woodard,* 341

21

S.W.3d 404, 410-11 (Tex.Crim.App. 2011). The Fourth Amendment is not implicated by consensual police-citizen encounters, and law enforcement is free to stop and question a citizen without needing a justification. *Id*., at 411. Citizens may terminate consensual encounters at will. *Id*. Such an encounter does not forfeit its consensual nature simply because the citizen is not informed that he can ignore the officer or terminate the encounter; his continued acquiescence to the request maintains its consensual nature. *Id*. Courts look at the totality of the circumstances surrounding the interaction to determine whether a reasonable person in the defendant's shoes would have felt free to ignore the request or terminate the interaction. *Id*. Generally, an encounter becomes a detention or arrest when an officer, through force or a showing of authority, restrains a citizen's liberty. *Id*., at 411.

Article 38.22 of the Texas Code of Criminal Procedure governs the admissibility of statements made by a defendant during custodial interrogation. TEX.CODE CRIM.PROC.ANN. art. 38.22. An oral statement is admissible against a defendant in a criminal proceeding if, among other things: (1) the statement was electronically recorded; (2) the defendant was given the warnings set out in Section 2(a) before the statement was made and it is included in the recording; and (3) the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. TEX.CODE CRIM.PROC.ANN. art. 38.22, § 3(a)(1)–(2). The warnings in Section 2(a) of Article 38.22 are virtually identical to the *Miranda* warnings, and as with the *Miranda* warnings are required only when there is custodial interrogation. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex.Crim.App. 2007)(*citing* TEX.CODE CRIM.PROC.ANN. art 38.22, §§ 3(a), 5).

*Analysis*

Here, the trial court held a suppression hearing outside the presence of the jury prior to Sgt.

22

Flores's testimony. Flores testified that when the plainclothes officers made contact with McGavitt he was cooperative and willing to speak with them and the officers called Flores to come meet with McGavitt because he was working on the case. When he arrived, Sgt. Flores thanked McGavitt for his cooperation, to which McGavitt responded, "[n]o problem. I'll speak to you guys." He testified McGavitt did not have a vehicle and the plainclothes officers offered to drive him to the police station. McGavitt was not handcuffed and at the police station waited in the common area. Flores testified he and McGavitt then walked to an unlocked interview room off of the common area to speak. Flores stated he informed McGavitt he was investigating a case involving a dead body and he wanted to ask him a few questions. McGavitt agreed, but Flores stated that before proceeding he read him his *Miranda* warnings because he had been trained to do so without exception. McGavitt volunteered that he had heard about the dead body on the news and stated that he had information to give, adding, "it wasn't me that did it." Flores stated he asked McGavitt if he would be willing to let him record the interview and McGavitt responded affirmatively. Once the recording began, McGavitt was again read his *Miranda* warnings and the interview proceeded from there. Sgt. Flores testified he arrested Appellant shortly after the recorded interview concluded.

At no point did Sgt. Flores testify to using force or a showing of authority to restrain McGavitt's liberty. His testimony was that McGavitt was cooperative throughout their interaction and at no point attempted to terminate the interaction. No contrary evidence was provided. The trial court implicitly found this version of events to be correct by denying McGavitt's motion to suppress, a finding we are required to give great deference because it was based on evaluations of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. Viewing the

23

evidence in a light most favorable to the trial court's ruling, we conclude the interaction between McGavitt and police was a consensual encounter all the way up to the point he was arrested at the conclusion of the recorded interview. *Carmouche*, 10 S.W.3d at 328. Because the interaction was consensual, *Miranda* warnings were not required and McGavitt's arguments to the contrary are without merit. *Herrera*, 241 S.W.3d at 526. Accordingly, McGavitt's fifth issue is overruled.

## CONCLUSION

Having overruled Issues One through Five, the judgment of the trial court is hereby affirmed.

March 7, 2019

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

24